UNITED STATES of America, Appellee,

v.

Willie George CHILDRESS, Appellant.

Nos. 90–3222, 90–3223 to 90–3230,
and 93–3066 to 93–3073.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 1, 1995.

Decided July 7, 1995.

Rehearings and Suggestions for Rehearing
En Banc Denied Sept. 13, 1995.

Stephen C. Leckar, appointed by the court, argued the cause for appellants Jeffrey L. Thompson and Raynice Thompson.

W. Gary Kohlman, appointed by the court, argued the cause for appellant Constance D. Perry.

William J. Garber, appointed by the court, argued the cause for appellant Rachelle Edmond.

Stuart F. Johnson, appointed by the court, argued the cause for appellant Robert McNeil Hardy.

Dennis M. Hart, appointed by the court, argued the cause for appellant Ronald Morgan.

Ernest W. McIntosh, Jr., appointed by the court, argued the cause for appellant Willie George Childress.

Arthur M. Levin, appointed by the court, argued the cause for appellant Columbus Daniels.

Sol Z. Rosen, appointed by the court, was on the joint briefs for appellant Melvin E. Stewart.

Helen M. Bollwerk, Assistant U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Richard L. Chamovitz, James R. Cooper, and S. Hollis Fleischer, Asst. U.S. Attys., were on the brief, argued the cause for appellee.

Before WALD, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion PER CURIAM.[1]

Separate opinion dissenting in part filed by Circuit Judge STEPHEN F. WILLIAMS.

---

1. Parts III, IV, VII, and VIII.A. of the opinion are by Judge Wald; parts V, VI, and VIII.B. & D.

PER CURIAM:

This is a consolidated appeal arising from the second and third trials of members of a narcotics conspiracy led by Rayful Edmond III. *See United States v. Edmond,* 52 F.3d 1080 (D.C.Cir.1995). We remand the conspiracy conviction of Robert Hardy and the murder and weapons convictions of Columbus Daniels for further proceedings, and we affirm all remaining convictions. In addition, we remand the cases of all appellants except Ronald Morgan for resentencing.

## I. INTRODUCTION

Appellants all stand convicted of participating in or conducting business with the Edmond narcotics conspiracy, an organized enterprise that sold massive quantities of cocaine in the District of Columbia in the late 1980s. The activities of the organization are detailed in *Edmond,* 52 F.3d at 1084–86. Twenty-nine people were originally indicted on a number of counts of conspiracy, narcotics-related activities, weapons offenses, and murder and other crimes of violence. In August 1989, the district court severed the counts of the indictment alleging weapons offenses and crimes of violence from those alleging conspiracy and drug-related activity. The court further divided the defendants indicted for drug crimes and conspiracy into two groups according to their roles in the enterprise, designating the leaders and principal members of the organization as Group I and the more peripheral actors—including all of the appellants here—as Group II.

Three trials were held. The Group I defendants were tried in late 1989; their appeals are the subject of *Edmond.* The appellants in this case were tried in the Group II proceedings beginning in February 1990. The government's evidence, which is described in detail in our analysis of the defendants' attacks on its sufficiency, indicated that Willie Childress made at least one fifty-kilogram delivery of cocaine to the Edmond organization; that Columbus Daniels was a local courier for the group; that Rachelle Edmond stored large quantities of the group's drugs and cash; that Robert Hardy

---

are by Judge Buckley; and parts I, II, and VIII.C. are by Judge Williams.

ran errands for the enterprise; that Ronald Morgan purchased a kilogram of cocaine from the group; that Constance Perry counted and deposited narcotics proceeds; that Melvin Stewart ran errands and sold cocaine; and that Jeffrey and Raynice Thompson packaged large amounts of drugs for street sale. The jury convicted all nine of conspiracy to distribute and to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a) and 846. It also convicted five defendants of additional crimes: Rachelle Edmond and the Thompsons were convicted of Travel Act violations on a conspiracy theory (18 U.S.C. § 1952(a)); Stewart was convicted of unlawful distribution of cocaine (21 U.S.C. §§ 841(a)(1) and (b)(1)(C)); and Morgan was convicted of possession with intent to distribute over 500 grams of cocaine (21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)(II)).

The trial on the weapons and murder charges—the third trial—took place in June 1990. The government's evidence suggested that appellant Columbus Daniels accompanied organization kingpin Rayful Edmond to a nightclub where the two met with a drug dealer who had purchased narcotics from Edmond. The three argued about money that the dealer still owed the organization. After the argument, Daniels shot the dealer seven times on Edmond's signal, killing him. The jury convicted Daniels of second-degree murder while armed and of carrying a pistol without a license.

In August 1990, the district court granted appellant Morgan's motion for acquittal of the conspiracy charge on the grounds that his single corroborated purchase of cocaine from the Edmond organization and his uncorroborated confession of multiple drug dealings could not establish that he was a regular participant in the narcotics enterprise. The court denied all of appellants' other post-trial motions, *United States v. Childress,* 746 F.Supp. 1122 (D.D.C.1990). Appellants were sentenced in September 1990.

All appellants now challenge their convictions in the Group II and III trials and the denial of their joint motion for a new trial. Eight of the appellants—all but Morgan— also challenge the length of their sentences. We have considered all of the objections raised by appellants, but given the enormous number of issues involved, we address only those meriting separate discussion. We reject those challenges we do not discuss. We begin with appellants' joint objections and then proceed to their individual ones.

## II. JURY AND COURTROOM PROCEDURES

Appellants jointly challenge the district court's overall conduct of the Group II trial. They claim that they were denied a fair trial by the district court's decisions to empanel an anonymous jury and keep it sequestered, to hold the trial in a secure courtroom, and to find the jury impartial notwithstanding its exposure to pretrial publicity. None of these decisions requires a new trial.[2]

### A. Anonymous and Sequestered Jury

Following the trial of the Group I defendants, the United States moved that the jury in the Group II trial be kept anonymous and sequestered. The district court granted the motion, *United States v. Edmond,* 730 F.Supp. 1144 (D.D.C.1990), ordering that the names, addresses, and workplaces of the Group II venire pool be withheld from all counsel and the media. To justify its order, the court cited numerous attempts by members of the Edmond group and their associates to disrupt the Group I trial and to intimidate witnesses with threats and actual violence. In addition, it credited a prosecutor's declaration that several potential witnesses refused to testify in the Group II trial out of fear and noted an FBI agent's sworn declaration that, according to a reliable informant, a reward was available on the street to anyone who assassinated a key government witness. *Id.* at 1146–47.

As a substitute for revealing the prospective jurors' names, addresses, and places of

---

2. Appellants also cite a number of the district judge's comments out of context in an effort to show that the judge was trying to curry favor with the jury; it is obvious upon reading the offending statements in context that this argument is without merit and borders on the frivolous.

employment or business, *id.* at 1149, the court gave the venire members a twenty-three-page questionnaire designed to solicit information about their demographics, general lines of work, and familiarity with the events and parties in the case, *id.* at 1159–65. It also sought to downplay the significance of the jury's anonymity and sequestration. Throughout the *voir dire*, the court told the venire members that keeping the jury anonymous and sequestered was "a common practice followed in many cases in federal court" and "in no way unusual"; it was being done "to protect your privacy ... [and] so that no one can later say that the integrity of the process was tainted by any improper outside contact or conduct." The court emphasized to the potential jurors that these precautions indicated nothing about the defendants' guilt or innocence and it repeated its explanation for the safeguards in its charge to the jury at the close of the trial.

Appellants now argue that the use of anonymous juries violates the Constitution because they create a prejudicial trial atmosphere and deny defendants meaningful opportunities to conduct *voir dire* and exercise peremptory challenges intelligently. In terms of their own trial, they claim that the government's assertions of potential danger to the jury were vague and did not implicate any specific Group II defendants; they also argue that the dangerousness of the Group I defendants and their behavior at the first trial cannot justify empaneling an anonymous, sequestered jury in the second case. Finally, they say, the district court's repeated anonymity instructions and statements that anonymity was routine (statements that in their view were obviously false), combined with the pressures of sequestration, subliminally communicated to the jurors that the defendants were especially dangerous and most likely guilty.

■ We reject these arguments. No court—state or federal—has ever held that the use of anonymous juries is *per se* unconstitutional, and no federal court has ever overturned a conviction rendered by an anonymous jury for that reason alone. In our recent decision upholding the empaneling of an anonymous jury in the Group I trial, we joined the Second, Third, Seventh, and Eleventh Circuits in approving of their use in some cases. *See Edmond,* 52 F.3d 1080; *see also United States v. Wong,* 40 F.3d 1347 (2d Cir.1994); *United States v. Ross,* 33 F.3d 1507 (11th Cir.1994); *United States v. Crockett,* 979 F.2d 1204 (7th Cir.1992); *United States v. Scarfo,* 850 F.2d 1015 (3d Cir.1988). We held that a district court may empanel an anonymous jury if it "conclud[es] that there is a strong reason to believe the jury needs protection [ ... and] tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *Edmond,* 52 F.3d at 1090 (quoting *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991)).

■ The Group I appellants assumed that a trial court's decision to empanel and sequester an anonymous jury was reviewable only for abuse of discretion, an assumption implicitly followed by the *Edmond* court. *See Edmond,* 52 F.3d at 1091 (holding that the empaneling of an anonymous jury is "left to the district court's discretion," subject to the broad constraints noted above) (quoting *Paccione,* 949 F.2d at 1192). Appellants in this case, however, assert that these decisions should be reviewable *de novo.* We disagree. Decisions on sequestration and anonymity require a trial court to make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings. With so many factors entering the calculus, each varying subtly, an appellate court's de novo resolution of the issue would merely duplicate the trial judge's efforts and yet yield almost nothing of precedential value. "Fact-intensive disputes, those whose resolution is unlikely to establish rules of future conduct, are reviewed under a deferential standard because the role of appellate courts in establishing and articulating rules of law is not at stake." *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 933 (7th Cir.1989) (en banc) (discussing application of Rule 11's "reasonable inquiry" requirement); *see also id.* at 936 (noting that "[f]act-bound resolutions cannot be made uniform through appellate

review, de novo or otherwise" and that an appellate pronouncement in such a case "is unlikely to establish clear guidelines for lower courts; nor will it clarify the underlying principles of law."); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990) (citing and quoting *Mars* with approval). Furthermore, some of the relevant factors, such as the degree of menace presented by the defendants and the intensity of media interest, may be only incompletely captured in the written record, so that courts of appeal are particularly ill-equipped to second-guess these judgments. *Cf. Scarfo*, 850 F.2d at 1023 (noting that review of decision to empanel anonymous jury "must be particularly deferential to the trial judge, familiar as he is with the local ambiance"). Finally, the factors counseling deference to the trial court's decision to empanel an anonymous jury apply equally to its decision on sequestration. *See United States v. Persico*, 832 F.2d 705, 718 (2d Cir.1987) ("[s]equestration is a matter committed to the sound discretion of the trial court, and its decision will not constitute reversible error absent a showing of actual prejudice arising therefrom"); *United States v. Greer*, 806 F.2d 556, 557–58 (5th Cir.1986) (similar).

■ The district court did not abuse its discretion in empaneling the Group II jury. The court reasonably found the serious potential for juror intimidation during and after the trial that would justify the extreme precautions of anonymity and sequestration. Though perhaps more peripheral than their Group I counterparts, the Group II defendants were still themselves alleged participants in an organized and extremely violent criminal conspiracy, and one of this group— appellant Daniels—stood accused of committing a brutal murder in furtherance of the conspiracy's ends. The organization retained the capacity to threaten and harm jurors, even though its highest leaders were in jail. Furthermore, the district court reasonably thought that the Group I defendants or their associates would be inclined to interfere with the second trial, given that most of the Group II defendants were close friends or family members of people convicted in the first round; in fact, five of the nine Group II defendants were married or otherwise related to one or more of the Group I defendants. Contrary to appellants' arguments, it was entirely appropriate in this context for the court to consider the dangers posed, not just by the Group II defendants themselves, but by other members of the conspiracy as well. *Cf. Wong*, 40 F.3d at 1377 (citing risks posed by non-defendant fellow gang members to justify anonymous jury); *United States v. Vario*, 943 F.2d 236, 240, 241 (2d Cir.1991) (attributing to defendant grand-jury tampering by co-conspirator and noting that "demonstrable history or likelihood of obstruction of justice on the part of the defendant *or others acting on his behalf*" justifies anonymity) (emphasis added).

In fact, the district court's experience with the Group I trial arguably provided it with *more* relevant evidence justifying an anonymous jury in this case than it possessed the first time around. Prior to the Group I trial, the court primarily knew just that the defendants allegedly belonged to a criminal enterprise that had used violence on the streets and that government informants had heard the lead defendant's father say he would "take care of" witnesses; the court's conclusion that the defendants or their colleagues might tamper with the upcoming proceedings required an inferential leap, albeit a proper one. But that first trial proved the inference correct: The court now knew that associates of the Edmond organization were *actually* willing and able to interfere with the criminal trials of group members, and the only necessary inference was that they might continue such transgressions. During the Group I trial, the house of one witness's mother was firebombed in the middle of her testimony, a potential witness was found shot after a letter from prosecutors was accidentally sent to a house she shared with a defendant, the court received bomb threats during the trial, and both the judge and courtroom personnel observed audience members communicating with the defendants by hand signals and glaring menacingly at witnesses and jurors. Furthermore, the declarations submitted by the government suggested that similar abuses might occur at the second trial. Such willingness to interfere with witnesses and

trial proceedings indicates a real danger that defendants might threaten or otherwise tamper with jurors. *See Edmond,* 52 F.3d at 1092. Finally, the district judge knew from his experience with the first trial that the Group II proceedings would likely attract increasing media attention as they progressed, heightening the danger that information identifying the jurors could become public and potentially exposing them to intimidation or harassment. This consideration, too, was proper. *See id.* at 1091.

■ We also find that the district court took appropriate precautions to minimize any prejudice to the defendants that might have resulted from the way the jury was empaneled. The court conducted a searching *voir dire* and gave jurors an extensive questionnaire, the scope of which appellants do not challenge. The judge's repeated statements downplaying the significance of anonymity and sequestration and stressing their irrelevance to the defendants' guilt or innocence were likewise appropriate. *See Edmond,* 52 F.3d at 1093 (approving identical instructions); *Ross,* 33 F.3d at 1521–22 n. 27 (approving of similar combination of downplaying safeguards and highlighting presumption of innocence); *Crockett,* 979 F.2d at 1216–17 (same); *United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989) (same). Further, in the absence of some concrete reason to believe that jurors would discredit the judge's suggestions that these procedures were commonplace, we will not indulge appellants' assumption that the jurors suffered some sort of cognitive dissonance between what they knew of the conduct of trials and what they saw, much less that they would be led to infer that the defendants were guilty. In short, we find error in neither the district court's initial decision to empanel and sequester an anonymous jury in the Group II trial nor its manner of doing so.

## B. Heightened Courtroom Security

■ The Group II trial took place in the "secure courtroom" of the United States Courthouse in Washington. That courtroom had a twelve-foot-high plexiglass partition separating the spectator section from the well of the court (i.e., the counsel tables, jury box, and bench). Two videocameras were located in the top rear corners of the courtroom. The record indicates that there were more courthouse security personnel than usual on hand throughout the proceedings, although we have no record as to how many officers were actually present at trial, where in the courtroom they were stationed, whether they were uniformed, and the like. It is also uncertain whether there was any additional security equipment (metal detectors, for example) in or outside the courtroom.

Appellants jointly petitioned to move their trial out of the secure courtroom and to reduce the number of security personnel present, claiming that these measures "impermissibly create[d] the impression of the assemblage of a group of wild desperadoes." The district court denied the requests, citing the security and manageability concerns presented by a trial with such a large number of defendants and involving "an organization that purchased its place in the community through the spilling of blood." During the Group II jury selection, however, the court did instruct the venire members to ignore the extra security precautions: The judge noted that many different civil and criminal trials were held in that same courtroom, that the partitioned courtroom design was common in courthouses across the country, and that uniformed security personnel were always present at criminal trials "in direct proportion to the number of defendants on trial." The court repeatedly made clear that none of these measures had anything to do with the guilt or innocence of the defendants, and it confirmed several times that the venire members understood the instructions.

■ Appellants now claim that these extra security measures—especially in combination with the jury's sequestration and anonymity—denied them a fair trial by signaling to the jurors that the defendants were dangerous and most likely guilty. They correctly point out that the constitutional presumption of innocence may be undermined by the physical indicia of guilt; criminal defendants do have a right to be free of court-imposed physical appearances that are unfairly suggestive of their guilt. *See, e.g., Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48

L.Ed.2d 126 (1976) (holding unconstitutional a requirement that defendant appear in prison garb at trial). On the other hand, this "does not mean ... that every practice tending to single out the accused from everyone else in the courtroom must be struck down," *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986), especially when the proceedings present legitimate security concerns to which the presiding judge must respond. Like the decision to empanel an anonymous jury, the trial court's choice of courtroom security procedures requires a subtle reading of the immediate atmosphere and a prediction of potential risks—judgments nearly impossible for appellate courts to second-guess after the fact. For that reason, the balancing of the competing concerns for the presumption of innocence and for the integrity of the courtroom and its proceedings is best left to the sound discretion of the trial judge. *See, e.g., Scarfo*, 850 F.2d at 1024; *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir.1988).

In light of the security concerns noted above and the large number of defendants at the proceedings, we cannot say that the trial judge abused his discretion. Appellants do not point to any evidence of actual prejudice resulting from the security measures taken in their trial. Nor will we presume prejudice: We agree with another district judge who has held trials in the secure courtroom that the plexiglass partition and the video-cameras (meticulously described in his opinion) are minimally intrusive, do not come between the jury box and the defendants or witnesses, and are far less stigmatizing than many other security measures—such as the shackling of unruly, flight-prone, or dangerous defendants—used in other courtrooms and upheld by other circuits. *See United States v. Whitehorn*, 710 F.Supp. 803, 835–41 (D.D.C.), *rev'd on unrelated grounds sub nom. United States v. Rosenberg*, 888 F.2d 1406 (D.C.Cir.1989). Appellants have likewise failed to demonstrate that the number of security officers present during the proceedings was disproportionate to the number of defendants being tried or that the officers were stationed in the courtroom in a way that might particularly influence the jury. Finally, the district court's lengthy instructions to the venire members seem more than adequate to alleviate any incidental prejudice that may have resulted.

## C. Pretrial Publicity

■ Prior to the severance of the trials, appellants moved jointly for a change of venue, claiming that the media attention focused on the proceedings would make a fair trial in the jurisdiction impossible. The motion stated that the case had attracted lots of publicity because of the large quantities of drugs the enterprise was alleged to have brought into the District, the number of homicides potentially connected to the defendants, the fact that several defendants associated with members of the Georgetown University basketball team, and the District's recent anointment as the murder capital of the nation. Thirty-eight articles from local newspapers were attached to the motion, many dealing with the defendants' proceedings, but others simply discussing drug violence, narcotics arrests, and gangs generally. The district court denied the motion for a change of venue; however, it included in the Group II juror questionnaire several questions asking whether venire members had been exposed to the media coverage of this or related cases, it individually questioned prospective jurors who had indicated on their questionnaires that they had been so exposed, and it asked the venire pool repeatedly whether they could put aside any opinions formed from this publicity.

After their conviction, appellants moved for an acquittal or a new trial based upon the denial of the change of venue. The district court denied the motion, holding that the media coverage of the case, though extensive, had been dispassionate and factual, that the court had screened extensively for potential bias, and that appellants' counsel had leftover peremptory challenges with which they could have stricken any juror they thought potentially prejudiced. *See Childress*, 746 F.Supp. at 1138–40.

Appellants now do not specifically challenge the denial of their motion for a change in venue, nor do they challenge the scope of the district court's questionnaire or *voir dire*.

Instead, they argue that the media attention surrounding the case was so inflammatory that the jury could not have rendered a fair verdict. Although they cannot point to any indications that a single juror was actually prejudiced by the pretrial publicity, appellants urge us to infer prejudice from the fact that twenty-seven members of the venire pool indicated that they had been exposed to the media coverage.

■ We reject this claim. The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity. Although the Constitution is understood to require that defendants be judged by "a panel of indifferent jurors," those jury members "need not be totally ignorant of the facts and issues involved," *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Rather, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723, 81 S.Ct. at 1643. We review the trial court's finding of juror impartiality only for "manifest error," *Mu'Min v. Virginia*, 500 U.S. 415, 428–29, 111 S.Ct. 1899, 1906–09, 114 L.Ed.2d 493 (1991); *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984); and absent a showing that individual jurors were *actually* prejudiced and unable to meet this standard, we will infer prejudice only in those "rare" cases, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), in which the community has been saturated with particularly damning publicity. The Supreme Court presumed jury prejudice, for example, where a defendant's videotaped murder confession was broadcast on three consecutive nights to audiences of 24,000, 53,000, and 29,000 people in a rural parish of 150,000 residents. *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). But such a presumption is reserved for only the most egregious cases. The Court, for example, would not presume prejudice even where a defendant's crime had provoked "substantial" unfavorable publicity—more than would have attended most capital murders because the defendant was an inmate charged with committing murder

while on work release and the crime had occurred during a presidential campaign highlighting similar crimes by furloughed inmates. *Mu'Min*, 500 U.S. at 428–30, 111 S.Ct. at 1906–08. The *Mu'Min* Court stressed the importance of the community context, which as here was part of the "metropolitan Washington statistical area, which has a population of over 3 million and in which, unfortunately, hundreds of murders are committed each year." *Id.* at 429, 111 S.Ct. at 1907.

Simply put, the standard is high, and appellants do not meet it. Appellants merely rehash the newspaper articles they submitted with their original motion for a change in venue before the Group I trial; the *latest* of these stories ran seven months before their own trial started. In fact, counsel for several appellants argued to the district court that media coverage just before the Group II trial had been so thin that jury sequestration and anonymity were unnecessary. Twenty-seven members of the venire pool may have been exposed to whatever publicity there was, but only two of these people made it onto the jury and then only after the court questioned them individually and appellants' counsel did not object. In short, we find no "manifest error" in the district court's finding that the jurors were impartial, *Childress*, 746 F.Supp. at 1139–40. As the *Edmond* court found in reviewing the Group I trial, "there is no reason for concluding that the population of Washington, D.C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial" that their right to a fair trial was violated. *Edmond*, 52 F.3d at 1099 (internal quotes omitted).

### III. Conspiracy Intent Instruction

■ Appellants challenge the trial court's refusal to instruct the jury that specific intent is an element of conspiracy. We conclude that the district court erred in instructing that a conspiracy to possess and distribute drugs under 21 U.S.C. § 846 (1988) is a general intent crime, but this error was harmless because its instructions correctly

apprised the jurors of the elements of intent they had to find in order to convict the appellants of conspiracy.

The district court instructed the jury that there are two elements to a conspiracy charge under § 846: first, that an agreement existed between two or more persons to distribute or possess with intent to distribute the requisite amount of cocaine or cocaine base, and second, that the defendant "knowingly and voluntarily joined the conspiracy." XIV Joint Appendix ("J.A."), 3/30/90 Tr. at 61. The court also instructed that the conspiracy charged "require[d] only a general intent. . . . Where this is so, and it is shown that a person has knowingly committed an act which the law makes a crime, intent may be inferred from doing the act." XIV J.A., 3/30/90 Tr. at 65. In elaboration on the requisite elements, the court explained that (1) the government was required to prove that the members of the conspiracy "came to a mutual understanding to accomplish an unlawful purpose or a lawful purpose by unlawful means," XIV J.A., 3/30/90 Tr. at 62, (2) that "the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member of the conspiracy," *id.* at 63, and (3) "if a defendant, with an understanding of the unlawful character of the conspiracy, knowingly encourages, advises or assists in furthering the purpose of the conspiracy, that defendant thereby becomes a knowing and voluntary participant and member of the conspiracy." *Id.*

Appellants objected to these instructions at the close of the evidence, arguing that conspiracy is a specific intent crime. Rachelle Edmond, for instance, argued that under conspiracy law a defendant "not only ha[s] to have knowledge, but . . . ha[s] to intentionally become a member [of the conspiracy] and . . . become a member with the specific intent of furthering the objects of the conspiracy." XIII J.A., 3/28/90 Tr. at 73. Raynice Thompson proposed an instruction that the jury must find that the defendants participated in the conspiracy "with the intent to see that the object and purposes of the conspiracy were achieved." Proposed

Modification of Jury Instructions (Mar. 30, 1990) at 2, *reprinted in* II J.A. at 158. The district court rejected these requests, adhering to its position that conspiracy under § 846 is a general intent crime.

In *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), the Supreme Court discussed the distinction between general and specific intent. Noting that the "venerable distinction . . . has been the source of a good deal of confusion," the Court observed that, "[i]n a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." 444 U.S. at 403, 405, 100 S.Ct. at 631, 632. As to the difference between knowledge and purpose, the Court explained that

a person who causes a particular result is said to act purposefully if he consciously desires that result, whatever the likelihood of that result happening from his conduct, while he is said to act knowingly if he is aware that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.

444 U.S. at 404, 100 S.Ct. at 631–32 (internal quotations omitted). The Court further explained that while proof of knowing action is generally adequate to support criminal conviction, certain classes of crimes merit "special attention" to "heightened culpability." *Id.* at 405, 100 S.Ct. at 632. Among these crimes, the Court identified conspiracy: "Another such example is the law of inchoate offenses such as attempt and conspiracy, where a heightened mental state separates criminality itself from otherwise innocuous behavior." *Id.*

With this understanding in mind, it is clear that conspiracy is a "specific intent" crime. The common law definition of conspiracy is " 'a combination of two or more persons . . . to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.' " 2 LaFave & Scott, Substantive Criminal Law § 6.5 at 86 (1986) (quoting *Commonwealth v. Hunt*, 45 Mass. (4 Met.) 111 (1842)). Thus, *purposeful* intent— or "conscious desire" to achieve a "result,"

*Bailey*, 444 U.S. at 404, 100 S.Ct. at 631—is the essence of conspiracy. Accordingly, as we have explained in the past, proof of conspiracy requires proof of specific intent to further the conspiracy's objective: "A single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective." *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.Cir.1988); *see also United States v. Clarke*, 24 F.3d 257, 264–65 (D.C.Cir.1994) (to convict defendants of conspiracy to possess drugs with intent to distribute, "the government had to establish ... that the defendants *purposefully* agreed to act in partnership") (emphasis in original); *United States v. Haldeman*, 559 F.2d 31, 112 (D.C.Cir.1976) ("[T]he specific intent required for the crime of conspiracy is ... the intent to advance or further the unlawful object of the conspiracy.").

Indeed, at oral argument the government conceded that the charged conspiracy is a specific intent crime. We briefly address ourselves to the district court's reasons for concluding otherwise. Recognizing that conspiracies are, in general, specific intent crimes, the district court nevertheless concluded that a § 846 conspiracy is different because (1) Congress legislated a distinct definition of conspiracy in § 846, *see United States v. Childress*, 746 F.Supp. at 1128 n. 8, and (2) several other circuits have construed the elements of a § 846 conspiracy to require that " 'the government must prove only that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy,' " *id.* at 1127 (quoting *United States v. Terzado–Madruga*, 897 F.2d 1099, 1121 (11th Cir.1990)). Neither ground is persuasive.

Although a § 846 conspiracy is different from a general federal conspiracy in certain other respects, they do not differ in the intent required. As the Supreme Court held in *United States v. Shabani*, — U.S. —, —, 115 S.Ct. 382, 383, 130 L.Ed.2d 225 (1994), a § 846 conspiracy, unlike a conspiracy under the general federal conspiracy statute, 18 U.S.C. § 371 (1988), requires no overt act. But this distinction is in the text of the respective statutes: § 371 requires proof

that "one or more of such persons do any act to effect the object of the conspiracy," while § 846 contains no such requirement. In the absence of a statutory requirement of an overt act, the common law controls, and the common law required no overt act. *See* — U.S. at —, 115 S.Ct. at 384.

With respect to the intent requirement, by contrast, there is no textual basis for a distinction between § 371 and § 846; they are equally silent on the issue. Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter [Control and Enforcement of Drug Abuse] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Section 371 provides: "If two or more persons conspire ... to commit any offense against the United States, ... and one or more of such persons do any act to effect the object of the conspiracy," each shall be guilty of conspiracy. As neither establishes an explicit intent requirement, each is governed by the general law of conspiracy, and the case law in this circuit and others is clear that conspiracy is a specific intent crime. *See, e.g., Tarantino, supra; United States v. Rivera*, 6 F.3d 431, 443 (7th Cir.1993) ("[B]ecause drug conspiracy is a specific intent crime, the government must prove intent as an element of the offense.") (internal citation omitted); *United States v. Rengifo*, 858 F.2d 800, 808 (1st Cir.1988) ("While association with conspirators is evidence of participation in the conspiracy, something more is needed to show beyond a reasonable doubt the deliberate, knowing, and specific intent of the defendant to join the conspiracy.") (internal quotation omitted).

In further support of its conclusion that a § 846 conspiracy is distinct from the general conspiracy statute, with no specific intent requirement, the court pointed to several circuit court opinions holding that " '[i]n order to convict a defendant of a Section 846 conspiracy, the government must prove only that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy.' " 746 F.Supp. at 1127 (quoting *Terzado–Madruga*, 897 F.2d at 1121 & collecting cases). These cases do not

support the district court's conclusion that there is no specific intent requirement in conspiracy. Although there is a "loose[ ]" "correspond[ence]" between " 'knowledge' [and] ... the concept of general intent," *Bailey,* 444 U.S. at 405, 100 S.Ct. at 632, a characterization of a crime as requiring knowledge does not of its own force preclude a specific intent requirement. To the contrary, the Eleventh Circuit, one of the district court's principal authorities, requires proof of specific intent in order to prove "knowing and voluntary" participation: "[t]o prove [the defendant's] knowing and voluntary participation, the Government must prove beyond a reasonable doubt that [he] had a deliberate, knowing, and *specific intent* to join the conspiracy." *United States v. Harris,* 20 F.3d 445, 452 (11th Cir.) (internal quotation omitted) (emphasis added), *cert. denied,* —— U.S. ——, 115 S.Ct. 434, 130 L.Ed.2d 346, *cert. denied,* —— U.S. ——, 115 S.Ct. 611, 130 L.Ed.2d 521, *cert. denied,* —— U.S. ——, 115 S.Ct. 612, 130 L.Ed.2d 521 (1994). Thus, although the "knowing" and "purposeful" terms are not always used with perfect consistency, there is, so far as we can see, no fundamental dispute that a § 846 conspiracy is a specific intent crime.

 Though the district court thus erred in instructing the jury that a § 846 conspiracy is a "general intent" crime, this error was harmless because the district court's instructions gave the jury adequate guidance on the intent required. Under the district court's instructions, the jury had to find that each defendant entered the conspiratorial agreement with the purpose of furthering the ends of the conspiracy—that he (1) "came to a mutual understanding to accomplish an unlawful purpose" and (2) "with an understanding of the unlawful character of the conspiracy, knowingly encourage[d], advise[d] or assist[ed] in furthering the purpose of the conspiracy." In so characterizing the elements of the crime, the district court clearly instructed the jury that a *purposeful* state of mind was required—the jury could not find someone to be a "knowing and voluntary" participant in the conspiracy without finding that he or she "came to a mutual understanding to accomplish an unlawful purpose." We are thus satisfied that the jury could not

convict under these instructions without finding what amounts to "the specific intent to further the common unlawful objective." *Tarantino,* 846 F.2d at 1392. In light of these instructions, the district court's incorrect identification of the crime as one of "general intent" was harmless.

## IV. SINGLE V. MULTIPLE CONSPIRACIES

Appellants argue that the evidence at trial varied from the indictment because it established multiple conspiracies rather than a single one and that they were prejudiced by this variance. In a related argument, several of the appellants argue that there was insufficient evidence to convict them of the charged conspiracy. Like the individual sufficiency-of-the-evidence arguments, "[t]he existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury." *Tarantino,* 846 F.2d at 1391. Our review of both claims is therefore limited to whether there is sufficient evidence—when viewed in the light most favorable to the government—to support a jury finding of a single conspiracy agreed to by the individual appellants. We address the claims together.

### A. Variance in Conspiracy Trials

 A defendant can establish a variance by showing that the evidence established multiple conspiracies rather than the single conspiracy charged in the indictment. Even if the defendant establishes such a variance, it is grounds for reversal only if the defendant also shows that he was substantially prejudiced by the variance—by, for instance, the spillover effect of evidence from other conspiracies to which he was not a party. *See Tarantino,* 846 F.2d at 1391.

### B. Single v. Multiple Conspiracies

 As is common in drug distribution cases, the government's theory in this case is that the evidence establishes a single "chain" conspiracy. Courts have long recognized that participants in a continuous drug distribution enterprise can be parties to a single conspiracy even if they do not all know one another, so long as each knows that his own

role in the distribution of drugs and the benefits he derives from his participation depend on the activities of the others. As the Second Circuit explained in concluding that separate groups of smugglers, middlemen, and retailers could form a single conspiracy to import drugs, "the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers.... That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant." *United States v. Bruno,* 105 F.2d 921, 922 (2d Cir.1939). Thus, while proof of conspiracy requires proof of an agreement, the jury may infer this agreement from the defendant's knowing participation in a distribution network organized along division of labor principles—in which his own role necessarily depends on the cooperation of other parties to that network: "The existence of such a vertically integrated, loose-knit combination may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further a common unlawful objective, e.g., the distribution of narcotics." *Tarantino,* 846 F.2d at 1393 (internal quotation omitted).

The chain metaphor, of course, is not without limits in its ability to establish a single conspiracy. Even if, for instance, there exists a core, single chain conspiracy, "certain players may have performed activities wholly unrelated to the aims of the conspiracy." *Tarantino,* 846 F.2d at 1393. In addition, some courts have been reluctant to conclude that the chain conspiracy construct can automatically bind all participants in a drug distribution enterprise into a single agreement when certain participants are involved in the enterprise during radically different time periods, *see United States v. Borelli,* 336 F.2d 376, 383–85 (2d Cir.1964), or when there are no indications of interdependence between the various participants, *see United States v. Anderson,* 39 F.3d 331, 337, 347 (D.C.Cir. 1994) (evidence of "an extensive cocaine distribution network organized and managed by" a single kingpin who "purchased cocaine from several suppliers ... and resold it to both wholesale distributors and street level dealers" "likely ... manifest[ed] ... several conspiracies rather than a single overarching one"), *en banc rehearing ordered on unrelated grounds,* 1995 WL 79398 (D.C. Feb. 14, 1995) (en banc); *United States v. Townsend,* 924 F.2d 1385, 1391, 1395–1402 (7th Cir.1991) (finding three separate conspiracies between three different suppliers and a common purchaser; "the liability of members of the distribution chain is predicated upon the notion that participants at different levels in the chain know that the success of those at each level hinges upon the success of the others and therefore cooperate for their mutual benefit").

In this case however, we do not run up against such limits. As detailed below, we find that the evidence against each appellant was sufficient both to tie him to the core of the drug distribution operations and to support the jury's inference that he knew of, depended on, and agreed to the related activities carried out by the co-conspirators.

■ *Overview of the Evidence.* In the course of the trial, the government presented evidence of a single coordinated drug distribution network, orchestrated by Rayful Edmond III and geared toward retail trade on "the Strip," a residential area in the 600 blocks of Morton Place and Orleans Place, N.E., with additional distribution in the separate Bates Street area of Northwest Washington. Between 1986 and 1989, police observed steady trafficking in cocaine and crack on the Strip, overseen by several co-conspirators who were tried in the Group I trial, including Emanuel Sutton, Jerry Millington, John Monford, James Antonio Jones, Keith Cooper, and Patrick McDonald. In 1988, police obtained search warrants for several stash houses on the Strip and carried out five separate searches, finding firearms and significant quantities of cocaine and/or money on each occasion. Shortly after one of these searches, the police found James Antonio Jones, Jerry Millington, and Patrick McDonald directing others in a clean-up of the house. On another occasion, a government agent purchased 13 grams of cocaine from appellant Melvin Stewart in the base-

ment of one of the houses on the Strip, and, upon execution of a search warrant of the house that evening, police found Stewart in the house along with other co-conspirators and large quantities of drugs and money.

In order to supply the Strip and the Bates Street operation, conspirators arranged large drug purchases from Los Angeles, using couriers such as appellant Willie Childress to ferry the money and drugs back and forth across the country. Edmond "lieutenants" such as Dave McCraw and James Minor took delivery of these drugs from the couriers and distributed them to safe houses on the Strip and Bates Street and to the apartments of various conspirators for storage, packaging, and further transport. On at least four occasions in the summer of 1988, McCraw and Minor retrieved cocaine from California couriers and drove it to Bates Street, where they were assisted by appellant Hardy in delivering the drugs to a house at Eighth Street and Rhode Island Avenue.

A large cohort of conspirators assisted in storing and packaging the drugs for retail sale. For our purposes, the most relevant evidence is that appellant Stewart spent several hours packaging cocaine for retail sale, that Raynice and Jeffrey Thompson regularly packaged 1–2 kilograms of crack three times a week over a period of three months, and that Rachelle Edmond regularly stored and made available for retrieval drugs at the

apartment she shared with Jerry Millington. Once the drugs were packaged, they were picked up by Edmond couriers such as cooperating witness Kathy Sellers, assisted on at least one occasion by Rachelle Edmond. The couriers would then deliver drugs daily to the stash houses early in the morning, unless told not to.

These same couriers also retrieved the sales proceeds from the Strip and brought the money back to various locations, including Rachelle Edmond's apartment and later her house. On one occasion in 1988, Sellers observed appellant Constance Perry in the basement of Rachelle Edmond's house counting a large sum of money with a money counting machine. The government also presented evidence that appellant Perry brought or sent envelopes and paper bags full of old, dirty bills in small denominations for deposit into different credit union accounts once or twice a week. Once, she and Rayful Edmond III brought in $19,000 in old bills in exchange for a treasurer's check. The government showed that Rachelle Edmond maintained a bank account with significant cash deposits during the time of her participation in the conspiracy.

 In sum, the government presented overwhelming evidence of a classic chain conspiracy operating between 1986 and 1989 to possess and distribute narcotics in the District of Columbia.[3]

---

**3.** In her individual articulation of the multiple conspiracies argument, Rachelle Edmond asserts, without elaboration, that "[t]he evidence would admit of separate conspiracies involving Rayful Edmond, III, Tony Lewis in another, the Butler brothers and Bennett in California and, of course, Alta Rae Zanville, who was involved in several, including others unknown at trial." Appellants' Brief at 149.

We find, however, that there is sufficient evidence of mutual dependence between the operations at the Strip and at Bates Street to support the jury's finding of a single conspiracy. The government presented wiretap conversations in which Rayful Edmond III—the overall leader—and Tony Lewis—who supervised operations at Bates Street—discussed their arrangements to retrieve drugs from California couriers and the current inventory and location of their drugs, and Edmond directed Lewis to whom he should provide drugs for retail distribution. These conversations permit a jury to find concerted action between Edmond and Lewis and that Lewis

worked under Edmond's direction. In addition, the jury heard evidence of significant overlap between the Strip and the Bates Street enterprise: James Minor and Dave McCraw, the members of the conspiracy principally responsible for taking delivery of cocaine from California couriers, were deeply involved in operations at both the Strip and Bates Street. Minor and McCraw delivered multi-kilo quantities of cocaine to Bates Street and also packaged crack and delivered it to the Strip; the government presented evidence of one incident when McCraw and Minor obtained a block of cocaine powder from Bates Street and bagged it for retail sale on the Strip. Further, Minor and McCraw were paid for their work by Millington, identified by government witnesses as an Edmond "lieutenant" on the Strip. From all this evidence, the jury could certainly have concluded that the Bates Street operation and the Strip were part of the single conspiracy led by Rayful Edmond III.

Rachelle Edmond further suggests that there were multiple conspiracies because certain con-

*The Individual Participants.* We further conclude that there was sufficient evidence against each of the appellants to conclude that she or he agreed to further the purposes of this single conspiracy. As detailed below, there was for each appellant evidence from which the jury could infer that she or he knew of the scope of the conspiracy, that the individual's own benefits depended on the related activities of the co-conspirators, and that, so knowing, she or he agreed to further the purposes of the conspiracy.[4]

*Jeffrey and Raynice Thompson*

■ The Thompsons argue that there was insufficient evidence that they agreed to enter the conspiracy and that they knew "that their benefits depended on the entire venture's success." Appellants' Brief at 102. The Thompsons note that they were not implicated in several of the conspiracy's activities—they were never at the Strip, they did not make cash deposits at the bank, they never made drug purchases in California. Details of what the Thompsons did do, however, provided ample basis for the jury to conclude that they agreed to enter the conspiracy with knowledge of its scope. Government witness Rae Zanville testified that, on or about December 1987, and at the direction of Rayful Edmond III, Raynice Thompson helped her bag crack and powder cocaine. And, three times a week from January through March of 1988 both Thompsons, again at the direction of Rayful Edmond III, cut and bagged one to two kilograms of crack

at a time and handed the packaged drugs to Kathy Sellers for transport. The government also introduced evidence of the Thompsons' otherwise unexplained affluence during this period: They invested tens of thousands of dollars in property in late 1987 and early 1988. From the quantity of drugs the Thompsons personally handled, the fact that they were knowingly preparing those drugs for street sale, and the evidence that they were doing so at the personal direction of Rayful Edmond III, the jury could have inferred an intent by the Thompsons to agree to and further a broad-scale conspiracy to distribute narcotics.

*Rachelle Edmond*

■ Rachelle Edmond argues as well that there was insufficient evidence that she knowingly and willingly became a participant in the Rayful Edmond–Tony Lewis conspiracy. She suggests that the government never succeeded in implicating her as any more than an associate of conspirators rather than as a participant. She was not charged with money laundering and maintains that evidence suggesting that she laundered drug money does not support her conspiracy conviction.

Contrary to Edmond's assertion, however, the government presented evidence of her participation in a wide range of the conspiracy's activities, including core drug distribution. Rachelle Edmond lived with co-conspirator Jerry Millington, who was tried and

spirators, such as Zanville and the California suppliers, worked separately and independently beyond the scope of the conspiracy. Even if true, the fact that certain conspirators engage in independent drug transactions does not on its own negate the existence of a single conspiracy. *See United States v. Tarantino,* 846 F.2d 1384, 1393 (D.C.Cir.1988) ("[E]ven if we determine that a chain conspiracy exists, we may still conclude that certain actions were outside the chain and formed a separate conspiracy."). Though genuine side deals would not be attributable to the conspiracy charged in this case, neither would their existence prevent the jury from concluding that a core, single conspiracy was also in operation simultaneously. *See United States v. Saro,* 24 F.3d 283, 288 (D.C.Cir.1994) ("[S]omeone who belongs to a drug conspiracy may well be able to foresee that his co-venturers, in addition to acting in furtherance of his agreement with them, will be conducting drug transactions

of their own on the side, but he is not automatically accountable for all of those side deals.").

4. Two of the appellants, Robert Hardy and Constance Perry, do not challenge the sufficiency of the evidence supporting their conspiracy convictions. The evidence against Hardy, which we discuss in detail in the section addressing his individual claims, established that he delivered large quantities of drugs and packaged a large sum of money. As discussed above, the evidence against Perry centered on extensive money laundering. *See supra* p. 711. From the fact that Hardy and Perry each handled extensive quantities of drugs and/or money over a sustained period of time, the jury could conclude that each knew of the scope of the conspiracy, the necessity of the activities undertaken by co-conspirators, and his or her own dependence on those activities, thus finding both to be parties to the overall agreement.

convicted with the Group I defendants. Although Millington's role in the conspiracy may have been greater than Edmond's, there was extensive evidence that Edmond herself knew of the scope of the conspiracy and acted in several different ways to further it. Government witness Sellers testified that at her request Edmond spoke to Millington to facilitate Sellers' entry into the conspiracy as a drug courier, that Edmond was with Millington when Sellers came to their apartment to retrieve drugs and that, on a few occasions, Edmond herself gave cocaine to Sellers for delivery down the line. Sellers further testified that Edmond accepted drug proceeds from Sellers in packages of $1,000 to $10,000 when Millington was not at home. Government witness Zanville testified in the same vein. She said that on one or more occasions Edmond and Sellers together retrieved crack packaged for street sale from Zanville's apartment, and that Edmond was with Millington when Zanville delivered packaged crack to their apartment. In addition, the government presented evidence of an FBI-recorded conversation between Rachelle Edmond and Zanville in which Edmond discussed the pending police investigation and efforts by herself and others to avoid surveillance and detection. During this conversation Edmond revealed detailed knowledge of the scope of the conspiracy—stating, among other things, that co-conspirators possessed guns, dealt in 35–pound quantities of cocaine, and had California connections.

Finally, the government introduced evidence of Edmond's unexplained wealth during this period. Notwithstanding her limited income as a hairdresser and the unemployment of her live-in co-conspirator Millington, she maintained accounts with thousands of dollars in cash deposits in 1987–88, purchased a 1987 Volvo with a $6,000 down payment, put a total of $45,000 in down payments on two houses, and paid an $11,000 mobile telephone bill during the same period.[5] This evidence *in toto* is more than adequate to support the jury's finding that Edmond was a knowing and voluntary partic-

ipant in the conspiracy who agreed to the furtherance of its purposes.

### *Melvin Stewart*

■ Melvin Stewart also challenges the sufficiency of the evidence tying him to the conspiracy. Stewart notes that a single sale of drugs is insufficient to support a conviction of conspiracy and argues that the core evidence against him consisted of just such a single transaction. The government agrees that evidence that Stewart sold 13 grams of cocaine to an undercover police officer in the basement of 407 M Street, N.E., is "[c]entral to the proof of Stewart's involvement in the conspiracy." Government's Brief at 100. As the government further notes, however, this was far from the *only* piece of evidence connecting Stewart to the conspiracy. Police testified that when they executed a search warrant at 407 M Street on the same evening that they had purchased the drugs from Stewart, Stewart was at the house along with other conspirators, a large amount of cocaine, and thousands of dollars. Six hundred eighty dollars was found on Stewart himself, even though he was purportedly unemployed. In addition, other witnesses testified to Stewart's involvement in the conspiracy on separate occasions. Government witness Denise Johnson told how one day in the summer of 1987 she and several other conspirators, including Stewart, packaged cocaine for street sale. Another government witness, James Mathis, who served as an undercover courier for the conspiracy, testified that he received from Stewart a payment of approximately $5,000 for a drug shipment he brought from Los Angeles to Washington, D.C. From these incidents, the jury could reasonably infer Stewart's knowledge of the conspiracy's scope and his agreement to further its aims.

### *Willie Childress*

■ Childress also argues that there was insufficient evidence to support his conviction for conspiracy. He maintains that the evidence identifying him as the California courier who brought 50 kilograms of cocaine to Dave McCraw and James Minor at the Crys-

---

**5.** Contrary to Rachelle Edmond's claim, proof of money laundering can support a conviction of conspiracy to distribute drugs. *See Tarantino,*

846 F.2d at 1396 ("The laundering of funds was *part* of the plan to distribute cocaine....").

tal City Days Inn in August 1988 was too thin, and that even if all the evidence presented were believed, he could not be tied to the overall conspiracy. Although the government's evidence against Childress is admittedly more circumstantial than for the other appellants, it nevertheless suffices to support Childress's conviction.

The evidence against Childress centered around a delivery of 50 kilograms of cocaine in August 1988, accepted by James Minor and Dave McCraw, and a similar delivery the week before about which there was no eyewitness testimony. Government witness Minor testified that he and Dave McCraw received a 50–kilogram package from an older bearded man with glasses, whom McCraw referred to as "Captain." Minor further testified that McCraw told him that he had received another 50–kilogram delivery from the same man a week earlier. Although Minor made no in-court identification of Childress, several pieces of circumstantial evidence permitted the jury to conclude that Childress was in fact the same "Captain" who made the deliveries: (1) Wiretap evidence showed that Rayful Edmond III tried unsuccessfully to reach the occupant of Room 226 at the Crystal City hotel on August 16. The next day Edmond was taped talking to co-conspirator Tony Lewis about giving something to two older people who had arrived in town in a van, one of whom Edmond called "Captain Willie." (2) The hotel records of the Crystal City Days Inn showed that a person signing his name "Willie Childress," listing his home state as California and his car as a Chevrolet van checked into Room 226 on August 5 and stayed more than one night. Although the hotel room records after August 7 were lost, telephone logs indicated that throughout the entire period and as late as August 15, calls were made from Room 226 to a California number that Childress claimed elsewhere as his own. (3) The signature on Childress's driver's license and that on the Days Inn records were both in evidence, and the government argued that they were identifiably from the same man. (4) In an interview with a Missouri Highway Patrol officer, Childress said that his nickname was "Cap." (5) At trial, Childress had a beard and wore glasses. From this sub-

stantial network of evidence tying Childress to the observed drug delivery of August 1988 and the prior recollected delivery, the jury could conclude that Childress was, indeed, the "Captain" who made the two deliveries.

Childress further argues that even if the jury could find that he was the "Captain" who made the drug delivery received by Minor, it could not, from this transaction alone, find him guilty of conspiracy. *Cf. United States v. Kimmons*, 917 F.2d 1011, 1016 (7th Cir.1990) ("The relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy.") (internal citation omitted); *accord United States v. Morris*, 836 F.2d 1371, 1374 (D.C.Cir.1988). *But see United States v. Medina*, 944 F.2d 60, 65 (2d Cir.1991) ("The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy."). However, the jury was entitled to credit Minor's testimony that the same "Captain" made *two* drug deliveries of 50–kilogram magnitude to the Edmond organization. Two deliveries of this magnitude suggest a continuity of relationship between Childress and the Edmond organization and support the inference that Childress knew that the organization to which he was delivering such a sizeable amount of drugs must involve a substantial distribution network. Evidence of these two deliveries is thus sufficient to prove his agreement to participate in the conspiracy.

*Columbus Daniels*

 Daniels likewise "adopts" the argument that there was insufficient evidence to support his conspiracy conviction. Appellants' Brief at 170. Daniels makes no particular argument in support of this claim and, in the face of record evidence of Daniels' substantial participation in the conspiracy, it is unsustainable. Government witness Desiree Murphy testified that on one occasion and at Rayful Edmond III's personal direction, Daniels retrieved between 89 and 93 kilograms of crack from a courier's apartment in Crystal City after the courier had been ap-

prehended in Los Angeles. In addition, police frequently observed Daniels on the Strip. On one occasion, Daniels fled from a Mercedes parked in front of 409 M Street, N.E., on the Strip, and the police recovered $9,000 from between the seats in which he and another conspirator had been sitting. From the facts that Daniels took direction from Rayful Edmond III, handled massive quantities of drugs on his behalf, and was seen on the Strip with large amounts of money, the jury could conclude that Daniels was a significant player in the Edmond conspiracy.[6]

In sum, review of the evidence presented at trial "disclose[s] a classic example of a narcotics sale and distribution conspiracy." *United States v. Gantt*, 617 F.2d 831, 846 (D.C.Cir.1980). Each of the appellants was engaged in an extensive and, in varying degrees, a continuing course of activity from which the jury could readily find that the appellants knew of the conspiracy's scope and agreed to further its purposes.[7]

## V. CLOSING ARGUMENT

Appellants raise myriad challenges to the prosecution's closing argument. Although the prosecutor acted improperly on certain occasions, none of his missteps so prejudiced an appellant as to warrant reversal of a conviction.

### A. Legal Framework

It is well established that a prosecutor may not use the bully-pulpit of a closing argument to inflame the passions or prejudices of the jury or to argue facts not in evidence. *See United States v. North*, 910 F.2d 843, 894 (D.C.Cir.1990). It is also the law of this circuit that, even where challenges to a prosecutor's closing argument have been preserved through timely objection, we will reverse a conviction and require a new trial only if we determine that the defendant has suffered "substantial prejudice." *Id.* at 897–98. We have

generally looked to three factors in determining whether improper remarks by the prosecutor sufficiently prejudiced a defendant: the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error. We have also framed the test

---

**6.** Appellants Jeffrey and Raynice Thompson, Childress, and Daniels further argue that the district court committed reversible error by failing to grant their motions for severance because the evidence against the co-conspirators tried jointly with them was much greater, with prejudicial spillover effect. Under Rule 14 of the Federal Rules of Criminal Procedure, a district court may grant a severance if "it appears that a defendant or the government is prejudiced by a joinder." Determination of the risk of prejudice is "le[ft] ... to the sound discretion of the district courts." *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993).

The district court was well within its discretion in denying severance to appellants. From the outset of the prosecution of this conspiracy, the district court took precautions to minimize prejudice. The court severed those counts of the indictment charging crimes of violence and firearms offenses from the conspiracy and drug-related counts. With respect to the drug charges, the district court further split the defendants into two groups, corresponding to their degree of involvement. Based on our review of the evidence summarized above, we are persuaded that the district court acted properly: The Group II defendants shared similar degrees of culpability, the government presented "independent and substantial" evidence against each of these appellants, and there was no dramatic dis-

parity between the proof offered against any of these appellants and their co-defendants. *United States v. Halliman*, 923 F.2d 873, 884 (D.C.Cir. 1991).

Appellant Hardy raises a more particularized severance argument, addressed to evidence at trial, which is discussed with his individual claims below. *See infra* p. 730 n. 13.

**7.** Appellants also argue that the district court erred in admitting a tape recording of a conversation between government informant Rae Zanville and Constance Perry as against all appellants except Perry. Out-of-court statements of co-conspirators are admissible if made "during the course and in furtherance of the conspiracy," FED.R.EVID. 801(d)(2)(E); otherwise they are inadmissible hearsay.

The district court admitted substantially the same tape recording in the trial of the Group I defendants, and the *Edmond* panel concluded that the district court did not clearly err in concluding that at least some of the statements made in the recording were "in furtherance of the conspiracy" and thus admissible. *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C.Cir.1995). In the absence of a challenge by appellants to any particular, prejudicial statement in the recording that may not have been "in furtherance of" the conspiracy, we accept the *Edmond* panel's holding that the recording was admissible.

for prejudice in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.

*Id.* at 895 (internal quotation marks and citations omitted). In weighing these factors, we have presumed that a jury acts with "common sense and discrimination" when confronted with an improper remark from a prosecutor and owes deference to the district court's assessment of such a statement's prejudicial impact on the jury. *Id.* (internal quotation marks omitted).

### B. Application

Many of appellants' numerous challenges to the propriety of the prosecution's closing argument are patently meritless. We address only those claims that warrant separate discussion.

#### 1. Largest drug conspiracy

In the beginning of his closing argument, the prosecutor stated:

Now, ladies and gentlemen, obviously as you have heard, this is, indeed, a sad occasion when you have a history of a family that were [*sic*] nourished from the womb and has been dealing in narcotics in Washington, D.C. on a scale larger than anything that we have heard about in the history of this particular city.

XIV J.A., 3/29/90 Tr. at 12. At this point various counsel for the defense objected, and the district court overruled their objections. *Id.* The prosecutor then continued:

The scale of this narcotic trafficking which made in the millions of dollars ... is of overwhelming magnitude.

*Id.* at 12–13. Appellants argue that these statements were improper because they were not supported by evidence in the record and because they were intended to arouse the passions of the jury.

 We find no reversible error. The prosecutor's statement that the narcotics trafficking was of an "overwhelming magnitude" did nothing more than invite the jury to draw a reasonable inference based on common knowledge and the evidence con-

cerning the quantity of drugs involved in the conspiracy. The prosecutor went too far, however, when he asserted that the drug operation was the largest in the history of the District. He had not introduced any evidence to support the charge. Nevertheless, we find the risk of prejudice to be insignificant. The scale of the drug trafficking was not central to the prosecution, and the government's evidence of appellants' involvement in the charged drug distribution conspiracy was sufficiently strong to persuade us that the case was not so close or the convictions so uncertain that the improper remark prejudiced appellants. Moreover, the district court mitigated whatever impact the erroneous statement might have had by repeatedly instructing the jurors to disregard the character of the indictment's charges, to decide the case based on the evidence alone, and to remember that "[t]he arguments of counsel are not evidence." XIV J.A., 3/30/90 Tr. at 107. In light of these instructions and the strength of the government's evidence, we conclude that the prosecutor's improper statement does not warrant reversal of the convictions.

#### 2. Attacks on defense counsel

Appellants also argue that in his rebuttal to their closing arguments, the prosecutor repeatedly and impermissibly accused defense counsel of trying to mislead the jury.

 We have noted that attacks on opposing counsel are inappropriate in closing argument, *see Carter v. United States,* 437 F.2d 692, 694 (D.C.Cir.1970); and the government concedes the fact. The government maintains, nevertheless, that the prosecutor's remarks were excusable because they represented an effort to meet the attacks on the prosecution's conduct and on the veracity of its witnesses that were made by various defense counsel in their closing arguments. Indeed, certain of the lawyers for the defense had suggested that key prosecution witnesses had perjured themselves as a consequence of government coercion. *See Childress,* 746 F.Supp. at 1135 (district court's opinion noting that "one defense lawyer accused the government of holding a shotgun to the heads of certain government wit-

nesses"). The prosecutor's purpose was to discredit the attacks on his witnesses' veracity by calling the jury's attention to the defense lawyers' misrepresentation of the prosecution's evidence.

■ Although we cannot condone this sort of response in kind, attacks by defense counsel on the prosecution may be taken into account when assessing the prejudice that may have resulted from a prosecutor's excesses. *See, e.g., United States v. Rodriguez–Estrada,* 877 F.2d 153, 159 (1st Cir. 1989); *United States v. Saenz,* 747 F.2d 930, 939–43 (5th Cir.1984). *Cf. United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985) (prosecutor's improper remarks in rebuttal did not rise to level of plain error, in part because of defense counsel's improper closing argument). On at least one occasion, we have noted that a prosecutor's offending statements "seemed to be a response to" defense counsel and treated this as one factor militating against reversal. *United States v. Perholtz,* 842 F.2d 343, 361 (D.C.Cir.1988).

■ In this case, defense counsel maligned the prosecution and its witnesses, and the prosecutor responded in kind. Moreover, defense counsel rejected an instruction that the district court proposed to read to the jury in order to cure any prejudice that might have resulted from both the defense counsel's and the prosecutor's excesses. We owe deference to the district court's assessment of "the impact of both sides' hyperbole upon the jury," *North,* 910 F.2d at 895; and here, we have no reason to question the court's conclusion that "the prosecutor's oratory was counterbalanced to a great extent by the equally fiery—equally improper— rhetoric employed by defense counsel." *Childress,* 746 F.Supp. at 1135 (internal quotation marks omitted). Accordingly, we cannot conclude that appellants suffered prejudice sufficient to justify the reversal of their convictions.

### 3. Receipts for improvements to Perry's home

■ Receipts for expenditures made to improve and furnish appellant Perry's residence were recovered during an unlawful search and were suppressed prior to trial. Perry elected to testify in her defense and, on cross-examination, the prosecutor questioned her about the many expensive improvements that had been made to her residence after she had purchased it. In his closing argument, the prosecutor asserted that $70,000 had been spent on new furnishings for her home. Defense counsel objected to the statement on the ground that it alluded to a fact not in evidence. The district court effectively overruled the objection, responding that "the jury's recollection [of the evidence] will control." XIV J.A., 3/29/90 Tr. at 19.

The prosecutor's statement was clearly improper because the government had introduced no evidence of the dollar value of the furnishings. Indeed, the government concedes as much. We find the error harmless, however. Although the prosecutor had failed to introduce evidence of the precise dollar amount attributable to the improvements and furnishings, his extensive cross-examination revealed that, over a three-month period, a number of costly improvements and purchases had been made to and for her home. These included a fence, an alarm system, a swimming pool, sets of dining room and bedroom furniture, a mirrored wall, new closets, new carpeting, a chandelier, and a new bathroom. Presented with this impressive list, the jury had an ample basis for concluding that tens of thousands of dollars had been spent on home improvements and furnishings within this period. Accordingly, we think it highly unlikely that the prosecutor's improper allusion to an actual dollar amount substantially prejudiced Perry or any other appellant.

### 4. George Derricott

■ During the trial, the government introduced evidence that connected a certain George Derricott with particular activities involving Constance Perry and Raynice Thompson. The prosecutor made reference to that evidence in his initial closing statement. In their closing arguments, counsel for Perry and Raynice Thompson responded by suggesting that if the alleged conduct had in fact occurred, the government would have

indicted Derricott along with the other defendants. In rebuttal, the prosecutor reminded the jurors of a statement by a police officer who, in responding to a question by one of the defense counsel, testified that the police were then seeking a warrant for Derricott's arrest. The prosecutor also suggested that Derricott's indictment might have been delayed because he was part of another operation that was still under investigation.

Appellants contend that these rebuttal comments improperly alleged facts that were not in evidence. In this instance, however, the prosecutor's statements were made not as part of his case-in-chief but in response to defense counsel's arguments that the government's failure to indict Derricott impeached its case-in-chief. In order to rebut the inference drawn by them, the prosecutor suggested reasons other than Derricott's innocence for the government's failure to indict him. *See* XIV J.A., 3/30/90 Tr. at 22 ("maybe Mr. Derricott's name wasn't in the indictment for a specific reason, maybe"). As the Supreme Court pointed out in *United States v. Young*, a prosecutor's remarks must be examined "within the context of the trial to determine whether [his] behavior amounted to prejudicial error." 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Here, the question of whether Derricott had been indicted was introduced by defense counsel and, as the district court noted, "[t]he prosecutor's remarks 'did no more than respond substantially in order to right the scale.'" *Childress*, 746 F.Supp. at 1133 (quoting *Young*, 470 U.S. at 12–13, 105 S.Ct. at 1045).

### 5. Police report

At trial, James Minor testified that he made five bulk deliveries of cocaine to appellant Hardy, including one 35–kilogram delivery in August of 1988. Hardy sought to impeach that testimony by demonstrating that it was inconsistent with Minor's prior description of the 35–kilogram delivery. Hardy called Detective John Robinson to testify concerning Robinson's report of a November 17, 1988, interview with Minor. On direct examination, Robinson recalled that Minor admitted that he had delivered 35 kilograms to a Tony Lewis at a home at First

and Bates Streets in Washington. In the course of the questioning, Hardy's attorney interrupted Robinson in order to confine his testimony to the contents of that November 17 interview:

Q: Did Mr. Minor tell you that after he met with Mr. Tony Lewis at 1st and Bates Street, he dropped off Tony Lewis, meaning he had gone somewhere with him in a car and then took him back to another location at 1st and Bates?

A: *There came a time when Mr. Minor later told me—*

Q: *No, I mean—what he said is in the report.* Let me strike that question. Did Mr. Minor state that on the day that he—

XI J.A., 3/22/90 Tr. at 160 (emphasis added). Robinson was unable to complete his answer on direct. On cross-examination, Robinson revealed that Minor had subsequently informed him that the 35 kilograms had later been transported to another location by a man named Fila–Rob, which was Hardy's alias. Thus, Robinson's testimony as a whole suggested that the 35 kilograms in fact did go to Hardy, via Lewis.

In reliance on Robinson's direct testimony, counsel for Hardy argued in his closing statement that Minor's testimony was inconsistent with Robinson's report. In rebuttal, the prosecutor responded:

Robert Hardy's claim is that there was a report that was written by an officer, and during the course of writing that report, the officer didn't write down the number of other times that Mr. Minor had said that Mr. Hardy had—that drugs were delivered to Mr. Hardy, because he tried to confine the officer, as you might recall, to a specific date, so that it would not come out and *you would not hear from the officer of the* other occasions that drugs had been delivered to Fila–Rob in the Bates Street area.

XIV J.A., 3/30/90 Tr. at 10. Appellants jointly and Hardy individually seek reversal on the ground that the prosecutor's statement in rebuttal effectively relied on the content of Robinson's report—which had not been admitted into evidence—to corroborate Minor's testimony. In addition, Hardy contends that the prosecutor improperly suggested that Robinson would have confirmed Minor's tes-

timony that he made other deliveries to Hardy.

■ We reject appellants' argument that the prosecutor referred to the contents of Robinson's report. Although we agree with the district court that the prosecutor's rebuttal comments were "convoluted at best," *Childress,* 746 F.Supp. at 1134, we believe that the most natural reading of this passage is that it referred to the attempt by Hardy's counsel to confine the scope of Detective Robinson's testimony on direct rather than the content of a report not admitted into evidence. We are more troubled, however, by the prosecutor's suggestion that Robinson would have testified that Hardy had received several other deliveries from Minor. While Robinson testified on cross-examination that the 35–kilogram delivery found its way to Hardy, he never testified as to the other deliveries alleged by Minor.

Hardy, however, did not suffer substantial prejudice from this misstatement because the case against him was particularly strong. First, from the one 35–kilogram delivery alone, the jury could have inferred that Hardy was a knowing and trusted player in the charged conspiracy. Second, independent testimony linked Hardy to the conspiracy. *Childress,* 746 F.Supp. at 1135 (recounting evidence against Hardy, including testimony that he had helped load a suitcase with $2,000,000 in cash for the purchase of a shipment of cocaine). Finally, the court repeatedly instructed the jury to rely on its own recollection of the evidence, not on the statements of counsel in closing argument.

#### 6. *Raynice Thompson's closing argument*

■ In her final argument, counsel for Raynice Thompson asserted that, because Jeffrey and Raynice Thompson had not been observed by police surveillance cameras in early 1988, the government's case against them was weak and contradictory. In response, the prosecutor explained that the Thompsons had not been the subjects of police surveillance in early 1988 because the government was unaware of their involvement in the conspiracy until early 1989, when Sellers and Zanville were arrested.

Appellants contend that this statement impermissibly referred to evidence before the grand jury. As the government notes, however, the prosecutor's statement referred only to the arrests of Sellers and Zanville, not to the content of grand jury testimony. Moreover, it merely offered an alternative explanation for the lack of photographs that Raynice Thompson's lawyer referred to in her closing argument. So once again, we reject the claim that the prosecutor committed an error in his closing statement that substantially prejudiced one or more of the appellants.

#### VI. TRAVEL ACT CONVICTIONS

■ The Travel Act provides, in pertinent part:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>
> . . . . .
>
> (3) ... promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform any of the acts specified in subparagraph[ ] ... (3), shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1952(a) (1988 & Supp. II 1990). The Act defines "unlawful activity" to include "any business enterprise involving ... narcotics or controlled substances...." 18 U.S.C. § 1952(b) (1988). To obtain a Travel Act conviction, the government must allege and prove (1) interstate travel or use of a facility in commerce (2) with the intent to promote an unlawful activity and (3) that the defendant *thereafter* performed or attempted to perform or facilitated the performance of an overt act in furtherance of the unlawful activity. *See, e.g., United States v. Hayes,* 775 F.2d 1279, 1282 (4th Cir.1985); *United States v. Wander,* 601 F.2d 1251, 1258 (3d Cir.1979).

## A. Sufficiency of the Indictment

▮ Appellants Raynice Thompson, Jeffrey Thompson, and Rachelle Edmond argue that the counts of the indictment charging them with Travel Act violations failed to charge that they had committed an offense. In pertinent part, the indictment declared

> From in or about March 1988, to in or about May 1988, [Jeffrey L. Thompson, Raynice Thompson and Rachelle Edmond] did unlawfully, willfully, and knowingly travel and cause others to travel in interstate commerce, from the State of Maryland to the District of Columbia, and elsewhere, with the intent to promote, carry on, and facilitate the promotion and carrying on of an unlawful activity, to wit: the distribution of and possession with intent to distribute cocaine and cocaine base, and the conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base ...; and thereafter [Jeffrey L. Thompson, Raynice Thompson, and Rachelle Edmond] did perform and attempt to perform acts, and did cause others to perform and attempt to perform acts, to promote, carry on, and facilitate the promotion and carrying on of said unlawful activity.

I J.A. at 27–29. Appellants argue that this count did not charge an offense because it failed to specify what overt acts they performed or caused others to perform subsequent to the alleged interstate travel.

▮ Appellants concede that they did not contest the sufficiency of the indictment below. Although they correctly note that an indictment may be challenged on the ground that it failed to state a charge at any time up to and including direct appeal, an objection to an indictment based on other "defects" must be raised before trial or will be deemed waived. Fed.R.Crim.P. 12(b)(2) & (f). Moreover, when a claim that an indictment fails to allege an offense is made for the first time after trial has commenced, the indictment will be "upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant [was] convicted." *United States v. Gironda,* 758 F.2d 1201, 1210 (7th Cir.1985) (internal quotation marks omitted). *See also*

*Wander,* 601 F.2d at 1259 (indictments that are tardily challenged are liberally construed in favor of validity).

Employing this standard, we conclude that the indictment can be construed to state an offense and that, accordingly, we need not reverse appellants' Travel Act convictions on that basis. All of the cases on which the appellants rely involved indictments that altogether failed to mention the statutory requirement of an overt act subsequent to the interstate travel or use of a facility in interstate commerce. *See Hayes,* 775 F.2d at 1282; *Wander,* 601 F.2d at 1259; *United States v. Sanchez [Vazquez],* 585 F.Supp. 990, 994–95 (N.D.Ga.1984). Thus, the indictments failed to alert the defense that the government had to prove the third element of the crime; namely, an overt act subsequent to travel that furthered the illegal activity. Here, the indictment charges the third element of the offense, albeit in conclusory language. As the government notes, at least four circuits have upheld Travel Act convictions based on virtually identical indictments. *See, e.g., United States v. Muskovsky,* 863 F.2d 1319, 1326–27 (7th Cir.1988); *United States v. Cerone,* 830 F.2d 938, 951 (8th Cir.1987); *United States v. Stanley,* 765 F.2d 1224, 1239–40 (5th Cir.1985); *United States v. Tavelman,* 650 F.2d 1133, 1138 (9th Cir.1981).

▮ Assuming *arguendo* that the indictment was technically defective because it failed to allege overt acts with sufficient specificity, we conclude nonetheless that it charged an offense under the Travel Act because it set out the essential elements of the crime. The time for appellants to challenge defects in the indictment other than its failure to charge an offense has long passed. Fed.R.Crim.P. 12(b)(2) & (f); *United States v. London,* 550 F.2d 206, 211 & n. 5 (5th Cir.1977) (noting that "[t]he questions whether an indictment sufficiently apprises a defendant of the charges against him and whether an indictment states an offense are both conceptually and procedurally distinct" because the former must be raised prior to trial). Finally, appellants have failed to explain how they were prejudiced by any lack of particularity in the indictment.

## B. Sufficiency of the Evidence

■ Appellants Jeffrey Thompson and Rachelle Edmond argue in the alternative that their Travel Act convictions are not supported by sufficient evidence. The government responds that the Thompsons and Edmond were properly convicted for the Travel Act violation committed by their co-conspirator, Kathy Sellers. Sellers participated in the conspiracy as a courier who regularly transported drugs from Maryland into the District of Columbia and the cash proceeds from the sale of drugs from the District into Maryland. She testified that Rachelle Edmond facilitated her entry into the conspiracy as a drug courier and that on numerous occasions she picked up drugs at Edmond's Maryland apartment and delivered them to points in the District and that she was given the drugs by either Rachelle Edmond or her companion, Jerry Millington. The government also presented testimony that at the direction of Rayful Edmond, Jeffrey and Raynice Thompson cut and bagged one to two kilograms of crack about three times a week over a three-month period. After the Thompsons had bagged the crack, Kathy Sellers would pick up the finished product and deliver it to points in the District.

Relying on the Supreme Court's explication of conspiracy liability in *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), we have held that

> a conspirator can be found guilty of a substantive offense based upon the acts of his coconspirator so long as the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

*United States v. Sampol*, 636 F.2d 621, 676 (D.C.Cir.1980). This standard is readily met here. Sellers' services as a courier were both in furtherance of and within the scope of the unlawful agreement to distribute crack and powder cocaine that the Thompsons and Edmond had joined. Her violation of the Travel Act was also reasonably foreseeable by the Thompsons and Edmond. At their residences in the District's Maryland suburbs, they placed large quantities of crack and powder cocaine packaged for street distribution in the hands of a courier for the conspiracy. They must have foreseen that at least some portion of those drugs would supply Rayful Edmond's massive distribution network within the District. Indeed, the evidence of foreseeability was sufficiently strong that the district court's failure to discuss the foreseeability requirement in its instructions concerning *Pinkerton* liability does not rise to the level of plain error. *Cf. United States v. Broadwell*, 870 F.2d 594, 609 (11th Cir. 1989) (finding no prejudicial error in district court's omission of "reasonably foreseeable" portion of *Pinkerton* instruction). Accordingly, we uphold appellants' Travel Act convictions on a conspiracy theory of liability. *See United States v. Auerbach*, 913 F.2d 407, 410 & n. 2 (7th Cir.1990).

## VII. SENTENCING

### A. Base Offense Level

■ Appellants Hardy, Childress, Edmond, Stewart, Perry, and Jeffrey and Raynice Thompson argue that the district court improperly used a " 'one size fits all' " method in sentencing the appellants by attributing 50 kilograms of cocaine to each appellant on the basis of its general finding that the conspiracy involved more than 50 kilograms of cocaine. Appellants' Brief at 78. We hold that the district court erred by failing to make individualized findings about the scope of each appellant's conspiratorial agreement and the evidence that led it to conclude in each of their cases that the 50 kilos distributed were reasonably foreseeable. We further conclude that this error was harmless only with respect to appellant Childress, who was found by the district court to have handled personally the full 50 kilos in furtherance of his conspiratorial agreement. Because Jeffrey Thompson failed to challenge the drug attribution below, we review his sentence for plain error only and find none.

*Conspiratorial Liability Under the Sentencing Guidelines.* Under the Sentencing Guidelines, the district court determines a defendant's base offense level by delineating his "relevant conduct." U.S.S.G. § 1B1.3

(1989).[8] In drug-related offenses, the base offense level depends on the amount of drugs involved in the "relevant conduct." *See* U.S.S.G. Ch. 2, Pt. D (1989). "Relevant conduct," in turn, encompasses the standard principle that a conspirator is liable for "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n. 1) (1989). Under this principle of conspiratorial liability, then, there are two substantive limitations on a defendant's responsibility for acts undertaken by co-conspirators: Those acts must be "in furtherance of" the same conspiracy to which the defendant has agreed, and they must be reasonably foreseeable to the defendant.

■ Because only that conduct of co-conspirators that is "in furtherance of" the conspiracy that the defendant has joined may be attributed to the defendant, proper attribution requires analysis of the scope of the conspiracy that the defendant has joined— the scope of his conspiratorial agreement. The scope of a defendant's conspiratorial agreement, in turn, depends on analysis of the sort we have engaged in above: First, does the evidence establish a single conspiracy, in which each *defendant has joined in the* overall scheme, or multiple conspiracies involving separate agreements; and second, are there any "side deals" by co-conspirators that are not attributable to the conspiracy joined by the defendant? *See supra* part IV.

■ Once it is ascertained that co-conspirators' *conduct is in furtherance of the* conspiracy to which the defendant agreed, the next question is whether that conduct was reasonably foreseeable to the defendant. Because we can only determine whether drug transactions entered into by co-conspirators were reasonably foreseeable to the defendant by examining the degree of the defendant's own involvement in and knowledge of the conspiracy, this assessment depends

on "factual findings regarding reasonable foreseeability as it relates to each appellant's conspiratorial participation." *Anderson,* 39 F.3d at 331, 353; *see also United States v. Edwards,* 945 F.2d 1387, 1393–94 (7th Cir. 1991).

■ *The Requirement of Individualized Findings.* In recent cases, we have concluded that in order to ensure careful adherence to these limitations on co-conspiratorial liability in Guidelines sentencing, the district court *itself* must make particularized findings about both the scope of the agreement that the defendant entered into and the basis on which it finds the amount of drugs reasonably foreseeable to that individual defendant. *See Edmond,* 52 F.3d at 1104–06; *Anderson,* 39 F.3d at 351–53 (in the context of uncertainty about whether the district court's application of the erroneous standard had been prejudicial); *Saro,* 24 F.3d 283, 288–90 (D.C.Cir.1994) (same). As articulated in *Edmond,* moreover, this requirement of findings is a strict procedural mandate: Even where the evidence likely supports the conclusion that there was a single conspiratorial agreement joined by all the defendants, the district court at sentencing must spell out in some detail the evidentiary basis for this conclusion. It must make "individualized findings ... linking each appellant's scope of participation in the conspiracy with the quantum of drugs attributed to [him]." *Edmond,* 52 F.3d at 1105.[9] A jury verdict convicting the defendants of participation in a single conspiracy does not obviate the need for these individualized findings by the sentencing court. Such a verdict speaks to the scope of the defendant's agreement only in very general terms: It does not address the question of which specific actions demonstrated at trial were in furtherance of that single conspiracy or were foreseeable to the conspirators. And it is only these actions that may form the predicate for the defendants' sentences.

---

**8.** The 1989 Guidelines were those in effect at the time of sentencing.

**9.** When the defendant does not object before the district court to the amount of drugs attributed to him, raising the issue for the first time on appeal,

then evidence strongly suggesting the existence of a single conspiracy is relevant to whether the district court's failure to make individualized findings about the scope of the *defendant*'s agreement rises to the level of plain error. *See infra* p. 727.

Other circuits have articulated similar requirements. The Seventh Circuit, for instance, explains that "[e]very sentence under the Guidelines must be supported by reasons.... 'Reasons' means something more than conclusions—a distinction important not only to the defendant whose future is at stake but also to the appellate process." *Edwards*, 945 F.2d at 1399 (internal quotation omitted). Accordingly, it insists that a district judge do more than state in "conclusory" terms that the quantity of drugs attributed was reasonably foreseeable to the defendant. *Id.* Rather, the judge must "set[ ] forth the reasons why the particular amount of drugs was reasonably foreseeable to him, with reference to the evidence before the court." *Id.; see also United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993); *United States v. Lanni*, 970 F.2d 1092, 1093–94 (2d Cir.1992).

■ *Sentencing in this Case.* Applying these standards to the sentencing of the appellants who raised challenges below on this issue—Hardy, Childress, Edmond, Stewart, Perry, and Raynice Thompson—we conclude the district court failed to make the requisite findings. Reviewing these appellants' presentence reports and the record of their sentencing hearings, we find that the district court did not engage in the requisite individualized analyses. As to most defendants, the district court simply stated the general conclusion that "the court finds ... by a preponderance of the evidence that the conspiracy of which this defendant stands convicted involved more than 50 kilograms of cocaine and more than 500 grams of cocaine base or crack and that this quantity of cocaine was reasonably foreseeable to this defendant." *See, e.g.*, XV J.A., Perry Sent. Tr. at 14. Indeed, with respect to the scope of the agreement analysis, there are, as in *Saro*, indications that the court "was actively employing the wrong legal standard" by focusing exclusively on reasonable foreseeability. 24 F.3d at 289. Thus, at Childress's sentencing hearing, the district court stated, "We are not talking about, for sentencing purposes, the *Pinkerton* theory. We are talking about something else ... namely, the concept of foreseeability, possession that was reasonably foreseeable on the part of other co-defendants in the conspiracy." XV J.A., Childress Sent. Tr. at 8. To the contrary, liability under the Sentencing Guidelines follows from "the well-settled principles of conspiracy law" enunciated in *Pinkerton*, 328 U.S. at 647, 66 S.Ct. at 1184, which hold conspirators responsible for conduct that is "reasonably foreseeable" *and* "in furtherance of their joint undertaking," *i.e.*, within the scope of the defendant's conspiratorial agreement. *Saro*, 24 F.3d at 288.

The district court summarized its sentencing determination in a written opinion: It "reache[d] the inescapable conclusion that the conspiracy involved more than fifty kilograms of cocaine," "f[ound] that each of these defendants knew or should have reasonably foreseen that fifty or more kilograms of cocaine were distributed during the course of the conspiracy," and, "[a]ccordingly, ... assign[ed] each defendant a base offense level of 36." *United States v. Edmond*, 746 F.Supp. 200 (D.C.Cir.1990). The district court used the same reasoning in sentencing both the Group I and Group II defendants, and the *Edmond* panel has already addressed itself to the infirmities of this approach.

As the *Edmond* panel explained, the district court's duty to " 'determine the scope of the conspiratorial agreement [the defendant] joined' " cannot be satisfied by general conclusions that the conspiracy as a whole distributed a certain amount of drugs. *Edmond*, 52 F.3d at 1104 (quoting *Saro*, 24 F.3d at 288; internal citations omitted), Rather, the district court must spell out specific findings about the individual defendants and their relation to the conspiracy in order to determine the scope of their conspiratorial agreement. This analysis might be similar to the one we have just engaged in with relation to appellants' claims of variance and insufficient evidence, *see supra* part IV; but our own conclusions do not satisfy what is, under *Edmond*, the district court's procedural duty to engage in this analysis in the first instance. Thus, in *Edmond*, too, the evidence pointed quite "strongly ... to the conclusion that each of these appellants agreed to join the overall scheme"; but we nevertheless found that "the District Court, not us,

[must] determine the proper scope of agreement." Op. at 722; *see also Saro,* 24 F.3d at 289 ("In some conspiracies, of course, each participant has joined ... in the overall scheme, so that the scope of the conspiracy *is* identical for each.... But the PSR here did not engage in this analysis.") (internal quotations omitted). Whatever the likelihood that it would do so, the district court as the finder of fact in the sentencing phase is not bound to arrive at the same conclusion about the structure of the conspiracy proven that we do in reviewing the jury verdict on appeal. By the same token, of course, our remand in no way suggests a belief that the pertinent substantive standards have not been met.

The district court's general determination of reasonable foreseeability was equally conclusory. The district court may not simply *assert* reasonable foreseeability: It must articulate specific findings in support of its determination "that each individual appellant's participation in the conspiracy made the entire drug amount reasonably foreseeable to him or her." *Edmond,* 52 F.3d at 1105; *see also Edwards,* 945 F.2d at 1399 ("[D]istrict judges should conduct this inquiry in a less conclusory fashion, setting forth the reasons why the particular amount of drugs was reasonably foreseeable to him, with reference to the evidence before the court.").[10]

■ We must next consider whether this error was harmless in any case, and again we turn to *Edmond* for guidance. In keeping with its view that the findings requirement is a firm procedural mandate, the *Edmond* panel found the error to be harmless *only* where the district court had made a specific finding that the individual defendant had personally handled the requisite amount of drugs in furtherance of the conspiracy. In all other instances—even where the defendants were found to have exercised a "managerial role" (which applied to none of the defendants in this case)—the *Edmond* panel determined

that the error could not be deemed harmless. Op. at 721. Applying this strict standard, we must conclude that the failure to make individualized findings was harmless only in the case of Childress, for whom the district court made a finding that he personally handled the amount of drugs attributed, 50 kilograms of cocaine. *See* XV J.A., Childress Sent.Tr. at 50 ("On August 16, 1988, Willie G. Childress delivered 50 kilograms of cocaine to David McCraw and James Minor....").

■ Finally, we turn to Jeffrey Thompson, who failed to raise this challenge below and thus can prevail only if he demonstrates plain error. Under *Saro,* plain error can be established where the trial court fails to make the requisite findings and it is reasonably likely that it would have made a different attribution if it had made the proper findings. *Saro,* 24 F.3d at 290. This standard is not met in Jeffrey Thompson's case. In light of our conclusion above that there was sufficient evidence to convict Thompson of participation in the single conspiracy charged and the trial testimony that the Thompsons personally packaged at least 36 kilos of *crack* for street sale,[11] *see supra* p. 712, we do not find it reasonably likely that the district court would have assigned Thompson a different and lower base offense level if it had made the requisite findings.

### B. Weapons Enhancement

■ All of the defendants except Morgan challenge the district court's two-point enhancement of their offense level for the reasonably foreseeable possession of firearms by other conspirators. The logic of *Edmond, Saro,* and *Anderson* applies with equal force to the firearms enhancement. The basis for holding defendants liable for firearms possession by co-conspirators is the same as the basis for holding defendants liable for drug transactions by co-conspirators: that the conduct was reasonably foreseeable and in furtherance of the conspiracy. Thus, to hold

---

10. For an example of the sort of findings that would satisfy this requirement, see our discussion of the sentencing court's findings in support of its conclusion that the possession of guns by co-conspirators was reasonably foreseeable. *Infra* pp. 724–725.

11. Under the Guidelines Drug Quantity Table applied by the district court, *see* 746 F.Supp. at 203 n. 3, Thompson's base offense level is available upon an attribution of either 50 kilos of cocaine or half a kilo of crack. *See* U.S.S.G. § 2D1.1 (Drug Quantity Table) (1988).

a defendant liable for possession of firearms by co-conspirators, the district court must make the same individualized findings as with respect to drug transactions: that the conduct was within the scope of that defendant's conspiratorial agreement and that it was reasonably foreseeable. Although in assigning the weapons enhancement, the district court made the requisite specific findings of reasonable foreseeability for several of the appellants, it failed in all cases to engage in the requisite analysis of the scope of their agreements.

■ With respect to reasonable foreseeability, the district court's findings were adequate for several of the appellants. The court concluded, for instance, that the use of guns was reasonably foreseeable to Hardy because Hardy personally "handled a substantial quantity of drugs and money." XV J.A., Hardy Sent.Tr. at 56–57. Its express findings about Hardy's personal involvement included the following: He handled large amounts of drugs and money at Bates Street on four occasions, including one occasion involving 35 kilograms of cocaine, and he "also help[ed] put in suitcases a couple of million dollars to be sent to California for the purchase of cocaine." *Id.* at 57. We agree that findings that a defendant handled such extensive quantities of drugs in the course of a conspiracy are adequate to support the conclusion that the use of guns by co-conspirators was reasonably foreseeable to him. *See, e.g., United States v. Pessefall,* 27 F.3d 511, 515 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1154, 130 L.Ed.2d 1112 (1995); *United States v. Bianco,* 922 F.2d 910, 912 (1st Cir.1991). In several of the other appellants' cases, the district court likewise made sufficient individual findings to supplement its basic theory that the guns were reasonably foreseeable because of "the large quantity of cocaine purchased, bagged, and sold during the life of the conspiracy." 746 F.Supp. at 207. *See* XV J.A., Thompson Sent.Tr. at 23, 26 (crediting trial testimony that a courier picked up "five bags with 100 ziploc bags inside" of crack cocaine "three to four times a week from the apartment of this defendant and his wife" for some period of time and concluding that "[y]ou handled a great deal of drugs, a very substantial quan-

tity ... and, therefore, the court finds that the possession of the gun was reasonably foreseeable to you"), XV J.A., Perry Sent. Tr. at 15 (possession of firearms by co-conspirators "was reasonably foreseeable to this defendant particularly in view of her wide range of knowledge of the scope of the conspiracy and its various members as demonstrated by the recorded conversations she had with Alta Rae Zanville which were consensually recorded"); XV J.A., Stewart Sent. Tr. at 27 ("[T]his defendant sold undercover officer Darrell Young a half ounce of cocaine out of 407 M Street, the very same day that a pistol was seized from that location and ... this defendant was inside 407 M Street, Northeast when the officers were executing a search warrant for those premises on that day.").

■ To conclude that the possession of guns was reasonably foreseeable, however, does not end the inquiry. *See Saro,* 24 F.3d at 288 ("[m]ere foreseeability is not enough"). All the gun uses mentioned by the district court in its written opinion involved Group I defendants, *see* 746 F.Supp. at 206–07, and such uses are not *automatically* within the scope of *these* Group II appellants' conspiratorial agreements. If, for instance, the evidence showed that there were separate hub and spoke conspiracies, each involving Rayful Edmond III, but not merged into one, the use of guns by participants in one hub could not be attributed to the participants in another. The question whether the users of the guns and the appellants in this case were merged into a single agreement requires careful analysis of a sort neglected by the district court. As Judge Friendly explained long ago, "[a]lthough it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *Borelli,* 336 F.2d at 384 (discussing the difficulty of applying the notion of conspiracy to "what in substance is the conduct of an illegal business over a period of years" and noting the "tendency in such cases to deal with the crime of conspiracy as though it were a

group [of men and women] rather than an act of agreement") (internal quotation omitted).

Because of the intricate, fact-intensive nature of this inquiry, it is proper for the district court to engage it in the first instance even where the evidence points quite strongly "to the conclusion that each of these appellants agreed to join the overall scheme, and 'it may well be proper for the sentencing court [on remand] to hold [appellants] responsible for'" the use of guns by co-conspirators. *Edmond*, 52 F.3d at 1105–06 (quoting *Saro*, 24 F.3d at 289). As the *Edmond* panel concluded, the individualized findings requirement compels "the District Court, not us, to determine the proper scope of agreement." *Id.*

## C. Conclusion

In accordance with the discussion above, we vacate the sentences of all appellants except Morgan. On remand, the district court must in each case make individualized findings about whether the scope of each appellant's agreement encompassed the use of guns. For appellants Hardy, Edmond, Stewart, Perry, and Raynice Thompson, we further direct that the district court make particularized findings on the quantity of drugs that may be attributed to each of these appellants.

## VIII. INDIVIDUAL ARGUMENTS

### A. Robert Hardy

■ Hardy objects to the district court's denial of his request to introduce expert testimony at trial that he was functionally mentally retarded. As we detail below, although Hardy handled a significant amount of drugs and money for the conspiracy, one might draw significantly different inferences about Hardy's state of mind from these activities depending on the degree of Hardy's mental acuity. We believe the proffered evidence of mental retardation was thus potentially material as to whether Hardy entertained the specific intent to further the purposes of the conspiracy, and we accordingly hold that the district court erred in categorically barring such evidence.

*Hardy's Role in the Conspiracy.* Taken in the light most favorable to the government, the evidence at trial demonstrated that Hardy was a frequent companion of the various co-conspirators, particularly Tony Lewis. Two co-conspirators testified about activities Hardy engaged in on behalf of the conspiracy. James Minor testified that on at least four occasions, Hardy helped him and Dave McCraw transport suitcases or athletic bags containing cocaine within the Bates Street area. On these occasions, Minor and McCraw brought drugs from Crystal City, Virginia, to Bates Street. At Bates Street, McCraw and Minor picked up Hardy on the corner—sometimes after going inside to receive instructions from Tony Lewis—and drove him to a house six or seven blocks away, at which point Hardy carried the container inside and came back out to be driven back to Bates Street. Minor testified that there was "general" conversation when he was in the car with McCraw and Hardy, but did not detail it. VII J.A., 3/8/90 Tr. at 128. Rae Zanville provided the other testimony of Hardy's activity in the conspiracy, describing an occasion when she picked up money to transport from Tony Lewis's apartment. She testified that there were several million dollars at Lewis's apartment and that Rayful Edmond III and Hardy put some of that money into her suitcases.

*The Psychological Report.* Prior to trial, Hardy was examined by a consulting psychologist. This psychologist found Hardy legally competent, but effectively retarded. He reported his "belie[f]" that Hardy could "assist [his lawyer] sufficiently, and sufficiently be helped to understand the court system, so as to be competent to stand trial," but also found that Hardy's

> behavior and limitations certainly restrict to some degree the completeness or elegance of defense that he can be provided. This is, after all, a man who can not read words such as "animal" or "himself," who cannot accurately report the direction of the sun's rising, or the general use of a thermometer, and who could not define the words "fabric," "enormous," or "conceal."

Letter from Lanning E. Moldauer to Joseph Virgilio 2 (Jan. 16, 1990), *reprinted in* II J.A.

at 115. With respect to Hardy's mental capacity, the psychologist reported:

> I ... found Mr. Hardy to be functioning just above the mentally retarded range of intelligence (his Full–Scale I.Q. was 71, two points above the strictest criterion for mental retardation). From a clinical standpoint, however, considering his functional illiteracy (below third grade reading level) and his poor social judgment and ability to cope, one could judge him as effectively retarded.

*Id.* at 1, *reprinted in* II J.A. at 114.

*Motion to Present Opinion Testimony.* Prior to trial, Hardy moved to introduce expert testimony "on the issue of whether Hardy, at the relevant times, had a mental state, including intelligence, consistent with and required for the offense charged, as well as the elements, overt act(s), and conduct alleged." Hardy's Motion for Leave to "Late"–File Attached Rule 12.2(b) Notice 2 (Jan. 30, 1990), *reprinted in* II J.A. at 88 ("First Expert Motion"). The district court understood the motion as one to introduce expert testimony on the issue of intent and denied Hardy's request on the ground that "such testimony is irrelevant and, therefore, inadmissible as defendant is only charged with a general intent crime in this case." *United States v. Hardy,* 730 F.Supp. 1141, 1142 (D.D.C.1990). The court reasoned that although "testimony on abnormal mental condition ... may be relevant to negative, or establish the specific mental condition that is an element of the crime," "when a defendant is charged with a general intent crime, as is the case here, evidence concerning a defendant's mental condition becomes irrelevant and confusing to a jury." *Id.* at 1143 (internal quotations omitted). Hardy subsequently renewed his motion, asserting that the testimony was relevant to whether he did, in fact, commit the acts ascribed to him as well as to the issue of specific intent. The district court rejected both grounds. It confirmed its earlier position that "a defendant's mental condition may be relevant to negate the *mens rea* element of the government's case in chief, when the defendant is charged with a *specific intent* crime.... [But] the diminished capacity argument does not apply where, as here, the defendant is charged with a general intent crime." *United States v. Hardy,* No. Cr. 89–0162–14, Order at 2 (D.D.C. Mar. 7, 1990), *reprinted in* II J.A. at 121. The district court also rejected Hardy's separate argument that the evidence was relevant to whether he had, in fact, committed the alleged acts, concluding that "[d]efense counsel greatly overestimates the sophistication of the acts that the defendant allegedly performed." *Id.* at 3, *reprinted in* II J.A. at 122.

On appeal, Hardy presses both grounds of admission—that the testimony should have been admitted to negate *mens rea* and to demonstrate the unlikelihood of Hardy's having carried out the alleged acts. We need only address his claim that the evidence would be relevant to his *mens rea*.[12]

*Admissibility of Mental Capacity Evidence in a Specific Intent Crime.* In *United States v. Brawner,* 471 F.2d 969, 1002 (D.C.Cir.1972), this court held that expert testimony about an abnormal mental condi-

---

12. At oral argument, the government suggested that Hardy did not press the *mens rea* argument below. There is some confusion in Hardy's papers before the district court. In his first motion, Hardy proffered the testimony "bearing on the issue of *whether Hardy,* at the relevant times, *had a mental state,* including intelligence, consistent with and *required for the offense charged,* as well as the elements, overt act(s), and conduct alleged." First Expert Motion at 2, *reprinted in* II J.A. at 88 (emphasis added). The district court took this as a motion to introduce the testimony on the issue of intent. In his subsequent motion, Hardy denied this characterization of his motion, "disavow[ing]" that he "want[ed] to introduce opinion testimony to negate defendant's intent." Notice of Intention to Introduce at Trial Opinion Testimony (Feb. 22, 1990) at 3, *reprinted in* II J.A. at 104. In the same motion, however, Hardy urged that the evidence was admissible to "negate ... *mens rea,*" "an element of the offense with which he is charged." *Id.* at 1, *reprinted in* J.A. at 102. It is not clear to us what distinction Hardy intended to draw between introducing the evidence to "negate ... *mens rea*" and introducing it to "negate defendant's intent."

Nevertheless, Hardy unequivocally and consistently asserted that the evidence should be admitted as relevant to *mens rea* in both motions; and the district court understood his motions in these terms, fully addressing the merits of the intent argument. Thus, in spite of some lack of clarity in his papers, the merits of this issue have been fully preserved.

tion is admissible when a specific intent crime is charged if "it is relevant to negate, or establish, the specific mental condition that is an element of the crime."

In the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 17, 4241 *et seq.* (1988 & Supp. IV 1992), Congress established the test for an insanity defense and further provided that "[m]ental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17(a) (1988). At the same time, Congress amended Federal Rule of Evidence 704(b) to provide that

> [n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Several courts have held that the admissibility of mental condition evidence survives the enactment of the Insanity Defense Reform Act of 1984 where (a) the evidence is admitted not as an affirmative defense to *excuse* the defendant from responsibility for his acts, but to negate specific intent when that is an element of the charged act itself, *see United States v. Cameron,* 907 F.2d 1051, 1060 (11th Cir.1990); *United States v. Pohlot,* 827 F.2d 889, 906 (3d Cir.1987); *United States v. Twine,* 853 F.2d 676, 679 (9th Cir. 1988), and (b) the expert limits his testimony to his " 'diagnoses, the facts upon which those diagnoses are based, and the characteristics of any mental diseases or defect the experts believe the defendant possessed during the relevant time period,' " staying clear of " 'directly or indirectly opining on the [ultimate] issue of specific intent,' " *United States v. Gold,* 661 F.Supp. 1127, 1131 (D.D.C.1987) (quoting *United States v. Frisbee,* 623 F.Supp. 1217, 1223 (N.D.Cal.1985)); *cf. Haas v. Abrahamson,* 910 F.2d 384, 397 (7th Cir.1990) (Rule 704(b) "exclude[s] psychiatric/psychological opinion testimony on the question of whether a defendant had the capacity to form the requisite intent constituting an element of the charged offense while allowing relevant expert testimony detailing the defendant's mental health history which might have tendency to negate the prosecution's proof on the issue of intent."). The government does not contend otherwise.

■■■ If evidence is potentially admissible as relevant to specific intent, it remains for the district court to "determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues." *Brawner,* 471 F.2d at 1002. This determination is reviewed for abuse of discretion. *United States v. Nelson,* 5 F.3d 254, 256 (7th Cir. 1993); *Cameron,* 907 F.2d at 1061.

Based on the record before us, we think there is a real possibility that the evidence proffered would properly be admitted. As we concluded above, the charged conspiracy is a specific intent crime. *See supra* part III. According to the district court's own instructions, the jury could find Hardy guilty only if it concluded that he "came to a mutual understanding [with his co-conspirators] to accomplish an unlawful purpose or a lawful purpose by unlawful means," XIV J.A., 3/30/90 Tr. at 61–62, and that "with an understanding of the unlawful character of the conspiracy, [he] knowingly encourage[d], advise[d] or assist[ed] in furthering the purpose of the conspiracy," *id.* The fact of Hardy's "effective" mental retardation might well have assisted the jury to determine whether Hardy entertained this conspiratorial understanding and purpose. *Cf. Penry v. Lynaugh,* 492 U.S. 302, 322, 109 S.Ct. 2934, 2949, 106 L.Ed.2d 256 (1989) (mental retardation is "relevant to the question of whether [the defendant] was capable of acting 'deliberately' ") (dictum). In particular, the evidence might help the jury to assess whether, or to what degree, it could infer the requisite specific intent from Hardy's commission of the charged acts. As detailed above, the strongest evidence implicating Hardy in the conspiracy was that he assisted in delivering bags containing drugs from Bates Street to another house six or seven blocks away on several occasions. While these acts would normally support an inference that he had the specific intent to further the object of the

conspiracy, his alleged mental retardation could well limit the viability of this inference.

Conceding that if the charged conspiracy is a specific intent crime, "a defendant may submit relevant evidence in an attempt to negate this element," Government's Brief at 131, the government nevertheless argues that the evidence was properly excluded in this case for three reasons. At the outset, we note that each of these arguments is directed to the exercise of the district court's discretion in excluding mental capacity evidence. That discretion, of course, was never exercised here; once it concluded that the evidence was categorically barred because the charged conspiracy required only "general intent," the district court never went on to "determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues." *Brawner*, 471 F.2d at 1002. As none of the objections raised by the government precludes the use of the testimony, we remand the issue to the district court so that it may have the opportunity to exercise its discretion in line with our discussion below.

The government first argues that the psychologist's report had "little, if any, probative value," because it does not describe a mental condition severe enough to prevent Hardy from being capable of forming criminal intent. Government's Brief at 133. We are persuaded, however, that Hardy has presented evidence of mental incapacity severe enough that it might well be highly relevant to Hardy's capacity to entertain, and whether he did in fact entertain, specific intent to further the purposes of the conspiracy. "This is, after all, a man who can not read words such as 'animal' or 'himself,' who cannot accurately report the direction of the sun's rising, or the general use of a thermometer, and who could not define the words 'fabric,' 'enormous,' or 'conceal.'" Although the district court can only make a final determination about the probity of the evidence after further inquiry and *voir dire* of the expert, Hardy has come forward with enough evidence to warrant this inquiry.

Second, the government argues that the evidence proffered by Hardy does not sufficiently focus on Hardy's state of mind or capabilities at the time of the offense because it points to events in his childhood to explain Hardy's effective retardation. Several courts have suggested that "the use of evidence to show that a defendant lacks the capacity to form mens rea" is inappropriate, while "the use of evidence of mental disease to show that a defendant actually lacked mens rea" at the time the crime was committed is appropriate. *Pohlot*, 827 F.2d at 905; *see also Haas*, 910 F.2d at 397. Upon analysis of these cases, however, we find no general bar to evidence of a defendant's general "lack of capacity" or the history of his condition, so long as that evidence is adequately keyed to the issue of whether he entertained the *mens rea* required for proof of the crime.

The concern underlying these cases appears to be to preserve the barrier between *mens rea* testimony and "diminished responsibility" testimony. Courts typically allow testimony directly about whether the defendant entertained the requisite intent at the time of the crime—testimony, for instance, that the defendant genuinely but delusionally believed he was acting in self-defense when he killed someone. They are reluctant, however, to allow more general testimony about the defendant's mental condition where it is divorced from the intent elements of the crime and "slide[s] into wider usage that opens up the jury to theories of defense more akin to justification." *Pohlot*, 827 F.2d at 905. As examples of this potential slippage, the *Pohlot* court noted cases such as *People v. Wolff*, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959 (1964), in which the defendant "had carefully planned and executed a series of murders and rapes," but the court nevertheless concluded that he lacked the requisite intent for first degree murder because his "mental abnormality prevented him from realizing 'the enormity of the evil.'" 827 F.2d at 905. "In this way," the *Pohlot* court noted, "the court made mental illness that did not directly correlate to any particular element of mens rea a ground for reducing the severity of an offense." *Id.*

We share the concern that evidence of general mental capacity not be used to persuade a jury that a defendant is not responsible for his deliberate and purposeful activity—this usage exceeds the bounds of *mens rea* evidence. The distinction between evidence of a defendant's general "ability to form a certain intent" and evidence of his intent at the time of the crime, however, is not particularly helpful: Both types of evidence may be relevant to the jury's consideration of whether the government proved that the defendant entertained the requisite intent. Thus, "[t]he proper focus [is] on the proffered link or relationship between the specific psychiatric evidence offered and the *mens rea* at issue in the case." *Cameron*, 907 F.2d at 1067 n. 31. Indeed, even the Seventh Circuit, which has been particularly vigilant in rejecting "testimony on the question of whether a defendant has the capacity to form the requisite intent," has not suggested that this bar on general capacity testimony prevents the admission of evidence about the history and development of a defendant's mental condition. To the contrary, it has concluded that "relevant expert testimony detailing the defendant's mental health history which might have a tendency to negate the prosecution's proof on the issue of intent" is admissible. *Haas*, 910 F.2d at 397; *accord Nelson*, 5 F.3d at 256.

▆▆ In sum, concerns about whether the evidence is relevant to negate specific intent as opposed to "present[ing] a dangerously confusing theory of defense more akin to justification and excuse" are best addressed through the district court's assessment of the reliability and probity of the evidence and its "careful administration" of that evidence, *Brawner*, 471 F.2d at 1002, rather than through a categorical bar on evidence regarding general mental capacity. In this case, we think it sufficiently likely that evidence about Hardy's general mental capacity and history would be relevant to his actual state of mind in committing the charged acts to warrant further consideration by the district court. In the event that the district court chooses to admit the evidence, it can ensure that the testimony is closely tailored to the question at issue. *See Gold*, 661 F.Supp. at 1131.

Finally, the government argues that the proffered evidence is, in fact, of the "diminished responsibility" variant. "By asserting a lack of intelligence," the government claims, "Hardy really seeks to be excused from his criminal activity. Although Hardy may not have been the brightest of the Edmond crew, his low intelligence did not make his activity any less purposeful." Government's Brief at 135. As we have indicated above, the evidence might well, in fact, be helpful to a jury in determining whether Hardy's action was "purposeful" in the sense of evincing a specific intent to conspire, and this potential probity is precisely the question to which the district court must address itself. While Hardy's mental capacity does not "excuse" him from culpability for his activity—possessing and distributing drugs—it may well be relevant to whether the government proved an element of the conspiracy charge—that in committing such acts Hardy entertained the specific intent to further the purposes of the conspiracy—and thus to whether Hardy *conspired* to possess and distribute drugs.

▆▆ We therefore remand Hardy's case to the district court so that the district court may determine whether the proffered evidence is "grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues." *Brawner*, 471 F.2d at 1002. If the district court concludes that the evidence is properly admissible, it must vacate Hardy's conviction and grant him a new trial. If it determines that the initial exclusion of the evidence was correct because the evidence is irrelevant or unreliable, then Hardy's conviction may stand.[13]

13. None of Hardy's additional claims has merit. The district court did not err in rejecting his untimely motion—filed only in the fourth week of trial—to rely on the insanity defense. The only new evidence proffered to show cause for the untimely motion consisted of Hardy's school records, which simply amplify the conclusions already before Hardy in the psychologist's letter. The district court did not abuse its discretion in

## B. Rachelle Edmond

One of Rachelle Edmond's witnesses, Juanita Radden, testified on direct examination that she had stayed at Edmond's home and that a burglar alarm had gone off while she was there. On cross-examination, the prosecutor asked Radden if Edmond had ever told her "that the reason that they put that alarm system in is because they were robbed of approximately $200,000 in cash?" XI J.A., 3/23/90 Tr. at 240. Counsel for Edmond immediately objected. On being directed by the district court to answer the question, the witness said "no." *Id.* Edmond's counsel thereupon moved for a mistrial on the ground that the question was premised on a fact not in evidence. The court effectively ordered the prosecutor not to ask it again unless he was able to produce evidence that Edmond's home had in fact suffered a $200,000 burglary. The court also denied Edmond's motion for a mistrial. Later, Edmond's counsel renewed the motion, and the court again denied it. The court reminded the jury, however, that counsel's questions did not constitute evidence; and it instructed the jurors that they were to disregard the prosecutor's question regarding a burglary.

"[T]he single most important factor in [determining whether an improper question should result in a mistrial] is the extent to which the defendant has been prejudiced." *Tarantino,* 846 F.2d at 1413. We review a district court's denial of a motion for a mistrial only for an abuse of discretion. *Id.* Even granting the impropriety of the prosecutor's question, it was not so prejudicial that we must find that the court abused its discretion in denying the motion for a mistrial. Edmond's motion was based on a single question that had been answered in the negative, and it had been cabined by an immediate jury instruction. Moreover, as noted above, there was ample evidence to support Edmond's conviction. We have observed that "[n]ot every improper question or even answer is enough to void a trial." *United States v. Smith,* 891 F.2d 935, 939 (D.C.Cir. 1989). Here, as in *Smith,* "the denial of a mistrial ... does not even approach an abuse of [ ] discretion." *Id.*

## C. Willie Childress

### 1. Denial of Criminal Justice Act funds

During the Group II trial, cooperating witness James Minor testified that in a Virginia hotel in August 1988 he received a 50–kilogram delivery of cocaine from an older man from California wearing glasses—a man who other government evidence suggested was appellant Childress. To rebut this testimony, Childress asked the district court for Criminal Justice Act ("CJA") funds to call

concluding that the records did not constitute cause for an untimely motion.

Nor did the district court's admission of a redacted hearsay statement made by co-defendant Morgan that indirectly implicated Hardy mandate Hardy's severance. The only reference to Hardy in the statement was fully redacted, and the jury was instructed to consider the statement against Morgan alone. Where "all references to the defendant in a codefendant's statement are replaced with indefinite pronouns or other general terms, the Confrontation Clause is not violated by the redacted statement's admission if, when viewed together with the other evidence, the statement does not create an inevitable association with the defendant, and a proper limiting instruction is given." *United States v. Washington,* 952 F.2d 1402, 1406–07 (D.C.Cir.1991). In this case, the jury's connection of the redacted statement to Hardy would require a complex and unlikely negotiation of the evidence that falls far short of "inevitable association." The district court's admission of the redacted statement was not error.

Finally, the district court did not act in violation of the law in rejecting Hardy's request for a downward departure under U.S.S.G. § 5K2.13 (1989), which provides that "[i]f the defendant committed a non-violent offense while suffering from significantly reduced mental capacity ... a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense." Decisions not to depart downwards "are generally reviewable only to the extent that they were imposed in violation of law or were imposed as a result of an incorrect application of the Sentencing Guidelines." *United States v. Ortez,* 902 F.2d 61, 63 (D.C.Cir.1990). Hardy's argument that the district court's determination was in violation of the law because the district court did not afford him due process in assessing whether his "reduced mental capacity contributed to the commission of the offense" falls entirely flat in light of the fact that Hardy never even asked the court to permit him to call witnesses to testify at the sentencing hearing or suggested that he had additional information to present.

Dr. Wong, a California optometrist. Dr. Wong would evidently have testified that when he examined Childress's vision in 1989, his medical history card did not list a previous prescription for him; this might indicate that he did not wear prescription glasses at the time of the 50–kilogram transaction. Appellant told the court that Dr. Wong's fee for travel and testimony time would be $200 per hour, to which the court responded that CJA regulations required special approval of the chief judge of the district court for expert fees over $1,000. Although the court expressed skepticism about the need for such testimony, it nevertheless agreed to consider the motion.

The next day Childress withdrew his request. His counsel suggested that he would instead look for a local optometrist who could testify about Childress's prescription record. Five days later and two hours before he was to present his case to the jury, however, Childress renewed his request for CJA funds for Dr. Wong because he had been unable to find a local optometrist who could testify in person rather than by telephone. The court denied the request, finding it would intolerably delay the proceedings; it also denied Childress's motion for a mistrial and post-conviction motion for a new trial, concluding that he was not prejudiced by the lack of funds for Dr. Wong. *Childress*, 746 F.Supp. at 1141–42. At trial, Childress did not introduce the prescription record into evidence; instead, his sister testified (and received CJA funds for her testimony) that he wore neither prescription glasses nor sunglasses in August 1988; and he introduced his driver's license, which listed no vision restrictions.

■■■■■ Childress again argues that he was wrongly denied the CJA funds for Dr. Wong and that he was prejudiced by the denial. We reject these arguments. A district court deciding whether to authorize CJA funds for medical experts must determine "whether the service is *necessary* to the preparation and presentation of an adequate defense," *United States v. Chavis*, 476 F.2d 1137, 1141 (D.C.Cir.1973) (emphasis in original); *see also United States v. Anderson*, 39 F.3d at 343. We review this determination of necessity for abuse of discretion. *See*

*United States v. Nichols*, 21 F.3d 1016, 1017 (10th Cir.1994); *United States v. Castro*, 15 F.3d 417, 421 (5th Cir.1994); *United States v. Becerra*, 992 F.2d 960, 965 (9th Cir.1993). The district court here did not abuse its discretion by determining that Dr. Wong's services were not sufficiently necessary to the defense to justify spending thousands of dollars and calling the entire trial to a halt. Given that Childress would introduce his driver's license and his sister's testimony, the incremental value of Dr. Wong's testimony was slight: The blank on the prescription record could not establish conclusively that Childress had never worn prescription glasses and could say nothing about whether he ever wore *non*-prescription glasses, which would have been entirely consistent with Minor's testimony and the government's theory that Childress was the courier he had met.

■■■■ Furthermore, we do not believe that Childress was prejudiced as a result of the denial of the CJA funds. Childress argues that he was *forced* by the denial of funds to introduce his driver's license to show that he had no visual impairment. The prosecution then used the license as a writing exemplar to prove that Childress signed the receipts for the hotel room where the 50–kilogram deal took place; thus, Childress claims, he was forced to provide crucial evidence for the prosecution and was thereby prejudiced. But there was no logical, one-to-one correspondence between the denial of funds for Dr. Wong and Childress's decision to introduce the license. Even if Wong had been able to testify, Childress might well have introduced the license to bolster his claim that he did not wear glasses; as we have said, the value of Dr. Wong's testimony about the prescription record would have been slight. And had it occurred to Childress that the license would supply crucial evidence to the prosecution, he might well have chosen not to introduce it, even if Dr. Wong had testified. To the extent that Childress was in a bind, moreover, it was largely of his own making. He withdrew the motion for funds voluntarily, failed to find a local witness, and then reinstated his request two hours before his case was set to start. We will not over-

turn Childress's conviction on the basis of his tactical choices.

### 2. Criminal history category increase

■ Childress raises one challenge unique to his sentence. A Drug Enforcement Agency agent testified at his sentencing that in November 1988 Childress was stopped in Missouri for speeding and that the van he was driving was found to contain over 500 kilograms of cocaine. The agent also testified that this was the second largest inland seizure of cocaine in DEA history. Childress was convicted by a Missouri court of narcotics transportation in June 1989, but he had not yet been sentenced for this offense by the time of his September 1990 sentencing for conspiracy in the present case. The district court here found by a preponderance of evidence that Childress's criminal history category under the Sentencing Guidelines did not adequately reflect the seriousness of his conduct in Missouri; accordingly, it increased that category from I to II under § 4A1.3 of the Guidelines.

Childress argues that this increase contravened the explicit language of § 4A1.3. That section of the 1989 version of the Guidelines (the version in place for Childress's sentencing) read, in part, as follows:

> § 4A1.3. Adequacy of Criminal History Category (Policy Statement)
>
> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct ..., the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information may include, but is not limited to, information concerning: ...
>
> (d) whether the defendant was pending trial, sentencing, or appeal on another charge at the time of the instant offense.[14]

Childress argues that his "instant offense" was the conduct for which he is deemed to have participated in the Edmond conspiracy—that is, his 50–kilogram cocaine sale in August 1988. He notes that both his arrest and his conviction in Missouri took place after this date; hence, he argues, they could not be "pending ... at the time of the instant offense."

Childress's argument, however, neglects the fact that he was being sentenced for conspiracy, not simply for the possession or distribution of the cocaine involved in his 50–kilogram delivery. Conspiracy is an ongoing offense that lasts, absent one's affirmative withdrawal from the enterprise, as long as any co-conspirator continues to further common ends; because he does not claim he affirmatively withdrew from the conspiracy, Childress is criminally responsible—as noted above in part IV—for *all* of his compatriots' foreseeable conduct in furtherance of those goals. Thus, Childress's "instant offense" for purposes of § 4A1.3(d) lasted until the Edmond enterprise ceased operations, an event the district court placed in April 1989. *See Edmond,* 746 F.Supp. at 203 n. 3. At that point, Childress was pending trial for his actions in Missouri, and the district court could properly consider those actions under § 4A1.3(d). Furthermore, because the court did not clearly err in its factfinding and the extent of its departure was reasonable under the Guidelines as they then stood,[15] we uphold the increase in Childress's criminal history category. *Cf. United States v. Fadayini,* 28 F.3d 1236, 1241–42 (D.C.Cir.1994).

### D. Columbus Daniels

#### 1. Counsel of choice

Appellant Columbus Daniels asks that his murder and conspiracy convictions be set aside because he was denied his right to his counsel of choice in each of his two trials. *See Wheat v. United States,* 486 U.S. 153,

---

14. The current version of § 4A1.3(d) allows the sentencing court to consider only "whether the defendant was pending trial or sentencing on another charge," not whether he was pending appeal.

15. Childress notes that under § 4A1.2(a)(4) of the current version of the Guidelines, a sentenc-

ing court would account for the Missouri conduct by adding a point to the criminal history score, not by bumping the defendant up an entire category. This rule, however, was only added in the 1991 revisions to the Guidelines; it did not exist in the 1989 version that governed Childress's sentencing.

159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) (Sixth Amendment right to counsel includes "the right to select and be represented by one's preferred attorney...."). The Supreme Court has made it clear, however, that the right to counsel of choice is qualified in several important respects. For example, "a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." *Id.* Similarly, the "presumption in favor of [a defendant's] counsel of choice ... may be overcome not only by a demonstration of [the attorney's] actual conflict [of interest] but by a showing of a serious potential for conflict." *Id.* at 164, 108 S.Ct. at 1700.

By way of background, on August 8, 1988, Daniels was charged with murder in the District of Columbia Superior Court and retained R. Kenneth Mundy to represent him. Nine months later, Daniels was indicted in the United States District Court for the District of Columbia for the same murder and for membership in an alleged drug conspiracy. The D.C. murder charge was then joined with the federal charges. When a tentative date had been set for the trial of these charges, Mundy moved for a continuance and, on June 22, 1989, sent the district court two letters. In the first of these, he advised the court that his prepaid vacation conflicted with the proposed trial date, that he had been paid only a portion of his fee for his services, and that his requested fee had been set with only a homicide trial in mind whereas he now found himself "stuck" with a conspiracy trial that was vastly more complicated than the one he had originally undertaken. Mundy's second letter, which was written on behalf of his partner, Robert Mance, informed the court that Mance had not received his fee for representing a co-defendant, Emanuel Sutton.

The district court responded with an order which, among other things, directed Magistrate Judge Attridge to determine whether the participation in the trial of both Mundy and Mance posed a potential conflict of interest and whether one or both of them should remain in the case. The magistrate judge took note of the complex nature of the con-

spiracy and the large number of defendants in the case. He concluded that no one could fully anticipate what problems might develop as the government presented its case and as the defense attorneys for the 27 other defendants proceeded with their cross-examinations. Accordingly, he decided that he could not find that a conflict of interest would be unlikely to arise. He also concluded that although the two defendants had voluntarily waived their rights to conflict-free counsel, these waivers were not fully informed and, as a consequence, were ineffectual. He therefore recommended that both Mance and Mundy be disqualified from the case. The district court adopted that recommendation and subsequently appointed Arthur Levin to represent Daniels.

The court later divided the counts of the indictment into three groups, each to be the subject of a separate trial. As a result, the counts under which Sutton was indicted were assigned to Group I, while Daniels' counts (which included a firearms violation charge in addition to the conspiracy and murder charges) were divided between the other two. Levin represented Daniels in his Group II conspiracy trial and in his Group III murder and firearms violation trial.

As mentioned above, Daniels argues that the court improperly denied him his counsel of choice in both trials. In the alternative, he contends that, even if the court did not err when it first removed Mundy, it committed reversible error when it denied his subsequent request to be represented by Mundy in the separate murder trial.

### a. The conspiracy trial

 Although Daniels challenges the court's decision to disqualify Mundy from representing him in the conspiracy trial, he recognizes that its decision to reject his waiver of the right to conflict-free counsel is reviewed for an abuse of discretion. *See Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700. Because the Supreme Court has made it clear that the presumption in favor of a defendant's counsel of choice "may be overcome ... by a showing of a serious potential for conflict," *id.,* and because a conflict between Sutton and Daniels could have devel-

oped during the evolution of the government's conspiracy case, we find that the district court did not abuse its discretion when it disqualified Mundy.

### b. The murder trial

■ After the conspiracy trial ended in a conviction for Daniels, Levin informed the court three weeks prior to the date proposed for the murder trial that Daniels wanted Mundy to defend him in the Group III proceeding. The court denied Daniels' motion on the ground that the issue of Mundy's capacity to represent Daniels had already been decided. In response, Levin argued that although Mundy might have had a potential conflict in the conspiracy trial, that possibility was not present in the impending murder trial. Unpersuaded, the district court denied the motion. A week later, Daniels reiterated his argument, and the court again rejected it.

On June 6, 1990, the court granted Rayful Edmond's motion to sever his murder trial from that of Daniels and ruled that Edmond's trial would commence after Daniels' trial. Daniels was tried alone for murder and for carrying a pistol without a license and was convicted as charged on June 21, 1990. On appeal, Daniels argues that even if the district court did not err when it initially disqualified Mundy, it did so when it refused to reconsider Mundy's ability to represent him in the murder trial.

In response, the government first contends that even after the conclusion of the Group II trial, a potential for conflict continued to exist in the Group III trial because the homicide charge was related to the complex drug conspiracy. We are unable to discern how Mundy's representation of Daniels in the Group III trial could have presented a serious potential for conflict. There were only four defendants in the Group III proceedings, and the issues involving Daniels were well-defined. The government's murder case would not have required the kind of sweeping inquiry that was necessary to prove the conspiracy charges.

The government argues, in the alternative, that because Daniels moved for new counsel a month after a Group III trial date had been set and only three weeks before that trial was to take place, Daniels' request to be represented by Mundy constituted a "last-minute" request and, therefore, was properly denied as untimely. We have declared that a defendant's right to counsel must be weighed "against the public's interest in the orderly administration of justice." *United States v. Rettaliata,* 833 F.2d 361, 362 (D.C.Cir.1987). We believe, however, that the government exaggerates matters when it asserts that Daniels waited until the last minute and that his motion would have unduly disrupted matters in the district court. His motion to be represented by Mundy was made at the first Group III pre-trial hearing. The cases on which the government relies all involved a far shorter period of time between the initial request for substitute counsel and the scheduled trial date. *See, e.g., United States v. Poston,* 902 F.2d 90, 96–97 (D.C.Cir.1990) (district court did not abuse discretion when it refused motion for continuance the day before trial to allow new counsel appointed at defendant's request to prepare more thoroughly); *United States v. Richardson,* 894 F.2d 492, 496–97 (1st Cir.1990) (defendant asked to substitute counsel for the first time on the morning of trial).

Finally, noting that Mundy's June 22, 1989, letters cited other problems with his representation of Daniels, the government argues that the record does not indicate that Mundy would have been willing and able to represent Daniels in his Group III murder trial. Indeed, not only had Mundy complained, in June 1989, that Daniels had paid him only a portion of the fee set for the defense of the murder charge, but later, after Mundy had been removed from the case, Daniels sought and obtained court-appointed counsel on the claim that he had become indigent. Levin (who also represents Daniels in this appeal) replies that Mundy was willing to reenter the case and that this fact was communicated to the district court in a status hearing for which the reporter's notes have been lost. Although we are confident that Levin's statement was made in good faith, the gap in the record created by the loss of the reporter's notes leaves us without an adequate basis for determining whether and on what terms

Mundy would have reentered the case in May 1990. Having concluded that a serious potential for a conflict of interest no longer existed and that enough time remained before the scheduled trial date to accommodate Daniels' request, we remand the matter to the district court for an inquiry into whether Mundy would have been willing and able to reenter the case in May 1990.

■ If, after a hearing, the district court concludes that Mundy would have reentered the case on financial terms that Daniels could have met, the district court must vacate his murder and firearms convictions. Mundy's death during the pendency of this appeal does not moot this issue because the deprivation of his counsel of choice would entitle Daniels to a reversal of his conviction as a matter of constitutional right. *See United States v. Panzardi Alvarez*, 816 F.2d 813, 818 (1st Cir.1987) ("The right to choose one's counsel is an end in itself; its deprivation cannot be harmless"). Mundy's death does not deprive the district court of its power to grant Daniels the relief to which he would be entitled. Should the government elect to retry Daniels on these charges, Daniels must be afforded a reasonable opportunity to retain new counsel of choice with his own resources and be provided with court-appointed counsel if he proves unable to do so.

■ If, on remand, the district court concludes that Mundy would not have reentered the case on terms that Daniels could have met, we hold that Daniels was not denied counsel of choice and that his murder and firearms convictions must stand. Although the Sixth Amendment affords Daniels the right to be represented by a retained attorney absent a sufficient justification for removing that attorney, he has no constitutional right to *appointed* counsel of choice. *See Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697.

We recognize that the district court's inquiry will be complicated immeasurably by Mundy's death. We ask only that the district court examine the available evidence to determine whether and on what terms Mundy would have represented Daniels in the 1990 murder trial. We caution the court that Daniels should not be asked to bear the burden of producing a deceased witness. We note, finally, that even if the murder and firearms convictions are vacated on remand, the concurrent sentence for the conspiracy conviction will be unaffected.

### 2. Sentencing

■ Daniels also challenges the district court's upward departure from the guideline range when sentencing him on the conspiracy conviction. We believe that the court quite properly concluded that the guideline range did not reflect the seriousness of Daniels' crime in light of his role as an enforcer and executioner for the conspiracy. Moreover, the two-level enhancement imposed by the court falls well within the bounds of reasonableness. *Cf. United States v. Goines*, 988 F.2d 750, 778 (7th Cir.1993) (affirming two-level upward departure based in part on defendant's incitement of co-conspirators' acts of violence).

### IX. CONCLUSION

For the aforementioned reasons, we remand the conspiracy conviction of Robert Hardy and the murder and weapons convictions of Columbus Daniels for further proceedings, and we affirm all remaining convictions. In addition, we remand the cases of all appellants except Ronald Morgan for resentencing.

*It is so ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, dissenting in part:

I concur in all sections of the *per curiam* opinion except Part VIII.D.1. While I agree with the majority that the district court may have abused its discretion in denying appellant Columbus Daniels representation by lawyer Kenneth Mundy in the Group III murder trial, I would not remand the case for further proceedings. Because Mundy died shortly after oral argument in this case, there is no way Daniels could ever receive his representation on a retrial, should one be ordered. I would therefore hold his appeal moot.

Any relief we give a litigant must fit the error that was made. Daniels claims only

that he was erroneously denied *Mundy's* representation; he does not allege that he had other paid counsel of choice waiting in the wings that he was barred from using, that he ever sought such an alternative, or that the district court forbade him from making other arrangements for paid representation. (Indeed, the fact that the court appointed counsel for Daniels suggests that no one involved ever even considered the possibility of paid counsel other than Mundy.) Nor does Daniels suggest that the trial counsel he actually received was incompetent. *Cf. Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The ideal relief for the one error claimed would be to remand Daniels's case for retrial with Mundy as counsel. This has become impossible.

The majority's solution, a vacation of the conviction and a retrial, in no way fits this error. On any retrial, there are only two possibilities for Daniels's representation. First, Daniels may be as unable as he was before to find someone who will represent him for what he could pay, so that he might again receive appointed counsel. In that case, the retrial would be an *exact* duplicate of the first one in all matters relevant to this issue. On the other hand, Daniels may now be able to arrange for paid counsel. But Daniels never claimed he was forbidden from using paid counsel other than Mundy, and a retrial under these circumstances would be responsive only to an error never claimed and give Daniels something completely different from what (by hypothesis) the trial court erroneously denied.

Against the very slight value of this relief—relief that is at best only marginally responsive to the error made—stand the costs of requiring a new trial. *See Morris v. Slappy,* 461 U.S. 1, 14–15, 103 S.Ct. 1610, 1618, 75 L.Ed.2d 610 (1983) (absent *prejudicial* violation of Sixth Amendment right to counsel, court should consider costs of retrial in fashioning remedy; "[t]he spectacle of repeated trials to establish the truth about a single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources"). These costs do not seem worth bearing in a situation in which the defendant has fully enjoyed his *core* Sixth Amendment rights to counsel. "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

I have no quarrel with *United States v. Panzardi Alvarez,* 816 F.2d 813 (1st Cir. 1987), see Maj.Op. at 736 or *Bland v. California Dept. of Corrections,* 20 F.3d 1469, 1477–79 (9th Cir.1994), which hold—in cases where the counsel originally desired was available to conduct the retrial—that the deprivation of counsel of choice cannot be harmless error. Insistence on a showing of prejudice would either require an almost impossible comparison between the counsel actually serving and the hypothetical alternative, or it would effectively deny any appellate remedy. But this principle gives us no guidance as to how to proceed in these circumstances: That there was an error worth correcting in the usual case does not tell us how to proceed when the single logical correction is unavailable.

In sum, this is a rare case. If Mundy were still alive and were available to follow through with the potential retrial, I would concur in the majority's disposition. Likewise, if the appointed counsel Daniels received in place of Mundy at his murder trial had been incompetent, I would reverse the conviction and remand for retrial. As neither is the case, I think it would be better to let the error go uncorrected than to force the system to incur the burdens of another trial, welcome as the prospect of such a windfall may be to Daniels. Accordingly, I believe Daniels's claimed error is moot.